624 S.E.2d 887

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**James Blaine WALDRON, Defendant Below, Appellant.**

**No. 32693.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 15, 2005.

Decided Nov. 30, 2005.

Dissenting Opinion of Chief Justice Starcher Dec. 16, 2005.

Charles B. Mullins, II, Mullins and Morgan, P.L.L.C., Pineville, for the Appellant, James Blaine Waldron.

Darrell V. McGraw, Jr., Attorney General, Dawn E. Warfield, Deputy Attorney General, for the Appellee, State of West Virginia.

PER CURIAM:

James Blaine Waldron (hereinafter "Mr. Waldron") appeals from a July 23, 2004, sentencing order entered by the Circuit Court of McDowell County. In that order, the circuit court sentenced Mr. Waldron to seven years confinement in the penitentiary based on his conviction for voluntary manslaughter. On appeal, Mr. Waldron asserts four assignments of error, arguing that the circuit court: (1) abused its discretion when it refused to accept a plea agreement, (2) improperly allowed the introduction into evidence of gruesome photographs, (3) failed to preserve an observer's notes, and (4) improperly instructed the jury. Based upon the parties' arguments, the record designated for our consideration, and the pertinent authorities, we affirm the decisions of the circuit court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The facts of this case center around the criminal actions of Mr. Waldron and a co-defendant, Mose Douglas Mullins, Jr. (hereinafter "Mr. Mullins"). Mr. Mullins' criminal actions are not an issue before us; however, to understand the factual backdrop of this case, it is necessary to discuss Mr. Mullins and his actions in connection with Mr. Waldron. Mr. Waldron was indicted on one count of murder, and Mr. Mullins was indicted on one count of murder and two counts of malicious assault. The record reveals that Mr. Mullins was illegally selling the prescription drug, OxyContin, on behalf of a third party. Mr. Mullins testified that he was a drug addict and used more of the drugs than he sold. He became indebted to the third party for the remainder of the money due for the OxyContin pills. The third party worked out a deal with Mr. Mullins whereby Mr. Mullins would kill four people who had allegedly broken into the third party's home. The third party offered to waive Mr. Mullins' debt, and would also give him five thousand dollars for each murder, for a total of twenty thousand dollars. Thereafter, on May 13, 2001, Mr. Mullins was out of pills. He discovered that he did not have the money to purchase new pills or to pay the third party for the pills that he had used for his personal addiction. Mr. Mullins testified that he determined that he had to go through with the four killings.

Later that same day, Mr. Mullins invited Mr. Waldron to ride around with him. Mr. Mullins testified that he planned on killing the four targets if he happened to run into them. Further, Mr. Mullins testified that Mr. Waldron, at this time, had no idea of the murder plan. While driving around, the two ran into Jeffrey Mullins, Don Ball, and Chantel Webb. Jeffrey Mullins and Chantel Webb were two of the people whom Mr. Mullins was supposed to kill.[1]

Mr. Mullins offered Oxycontin pills to the others, and plans were made to meet at a

---

1. The third person, Don Ball, does not appear to have been a target. Mr. Mullins testified that

Don Ball happened to be with the wrong people at the wrong time.

secluded location. The two groups drove in separate cars and met at the chosen location. Mr. Mullins claims that it was during this drive that he told Mr. Waldron of his plan, and further, that Mr. Waldron agreed to be a look-out for the sum of one thousand dollars. Mr. Waldron avers that he at no time had any idea about Mr. Mullins' plan to kill anyone.

After arriving at the specified location, Mr. Mullins retrieved a gun that had been provided by the third party. He shot Chantel Webb, Don Ball, and Jeffrey Mullins. Don Ball fled the scene with five gunshot wounds, and Jeffrey Mullins was shot and left for dead. Chantel Webb was killed at the scene. Jeffrey Mullins survived, but was paralyzed as a result of his injuries. Don Ball eventually recovered. Mr. Waldron testified that he remained in the car the entire time, and that he didn't pay attention to the gunshots being fired because he was breaking up marijuana to roll a joint. However, Don Ball testified that he remembers seeing Mr. Waldron out of the car at the crime scene during the shootings. Further, Jeffrey Mullins testified that prior to being shot, he heard Mr. Mullins ask Mr. Waldron if everything was okay, and Mr. Waldron responded in the affirmative.

Following the shootings, Mr. Mullins threw the bodies of Chantel Webb and Jeffrey Mullins over an embankment. He and Mr. Waldron rode to a carwash where Mr. Mullins washed the blood stains from the car. They then disposed of the murder weapon and Mr. Mullins' blood-stained clothing. After a stop at a relative's house and a convenience store, Mr. Mullins then drove them to their homes, which were located beside of each other. The police were waiting for them when they arrived, and both were arrested.

Mr. Waldron was incarcerated from the time of his arrest until approximately three months later when he agreed to assist law enforcement officers in their investigation in exchange for leniency. Mr. Waldron submitted to a blood test, gave a voluntary statement, and directed police to the location of evidence such as the murder weapon and Mr.

Mullins' bloody clothing. Thereafter, Mr. Mullins entered a guilty plea to second degree murder and two counts of malicious assault. Mr. Mullins was sentenced to forty years for the murder, and two to ten years for each count of the malicious assaults, to run consecutively. For Mr. Waldron's assistance in recovering evidence, the State of West Virginia entered into a plea agreement. The agreement called for the state to dismiss the felony indictment against Mr. Waldron, Mr. Waldron agreed to enter a voluntary plea of guilty to. the misdemeanor charge of accessory after-the-fact, and the state agreed to recommend a period of one year confinement in the regional jail, a fine of two hundred fifty dollars, and all court costs.

On February 6, 2003, the plea agreement was presented to the circuit court, and it was refused. During the same hearing, the circuit judge disclosed his close personal relationship with one of the victim's family. The presiding circuit judge transferred the case to another circuit judge.[2] On March 3, 2003, the plea agreement was presented to the second circuit judge, who also refused to accept it. The court stated that the only plea it would entertain would be a felony plea.[3] The case was scheduled for trial, which resulted in a verdict of guilty of voluntary manslaughter. On July 14, 2004, the circuit court sentenced Mr. Waldron to seven years in the penitentiary. On September 30, 2004, upon a finding that Mr. Waldron was a recidivist based on his prior felony conviction, the circuit court sentenced him to an additional five years, for a total confinement of twelve years.

## II.

### STANDARD OF REVIEW

The appeal before this Court presents four assignments of error for our review. Given the various standards of review applicable to the different issues presented, specific standards of review will be discussed in relation to the alleged errors to which they pertain. Generally, however, jury verdicts

---

2. The second judge had presided over the co-defendant's, Mr. Mullins' case, and he had entered some of the previous orders in Mr. Waldron's case.

3. Mr. Waldron did not enter a felony plea because he had a previous felony offense of unlawful wounding, and was worried about recidivist consequences.

rendered in criminal cases are accorded great deference:

"A reviewing court should not reverse a criminal case on the facts which have been passed upon by the jury, unless the court can say that there is reasonable doubt of guilt and that the verdict must have been the result of misapprehension, or passion and prejudice." Syllabus point 3, *State v. Sprigg*, 103 W.Va. 404, 137 S.E. 746 (1927).

Syl. pt. 1, *State v. Easton*, 203 W.Va. 631, 510 S.E.2d 465 (1998). Mindful of this general standard of review, we proceed to consider the parties' arguments.

## III.

## DISCUSSION

On appeal to this Court, Mr. Waldron raises four assignments of error, arguing that the circuit court: (1) abused its discretion when it refused to accept a plea agreement, (2) improperly allowed the introduction into evidence of gruesome photographs, (3) failed to preserve an observer's notes, and (4) improperly instructed the jury. We will address each of these issues separately.

### A. Rejection of Plea Agreement

Mr. Waldron's primary assignment of error is the circuit court's refusal of the plea agreement. Mr. Waldron argues that a plea agreement is subject to principles of contract law, and that he is entitled to receive the benefit of the contract that he bargained for because he met his obligations under the agreement. The State argues that a trial court has the discretion to refuse any plea agreement.

■ The present case involves the circuit court's failure to accept a plea agreement. The specific reason for the rejection was because the plea agreement called for a guilty plea to a misdemeanor charge, but the trial court disapproved of a guilty plea to anything less than a felony charge. We have previously held that a trial court is under no obligation to accept a guilty plea. *See* West Virginia Rules of Criminal Procedure, Rule 11 (recognizing court's obligation to inquire into the accuracy of a guilty plea and satisfaction that there is a factual basis for the plea); Syl. pt. 2, *State ex rel. Brewer v. Starcher*, 195 W.Va. 185, 465 S.E.2d 185 (1995) (holding "[t]here is no absolute right

under either the West Virginia or the United States Constitutions to plea bargain. Therefore, a circuit court does not have to accept every constitutionally valid guilty plea merely because a defendant wishes so to plead.").

By refusing to accept the specific guilty plea to a misdemeanor, the trial court, in essence, rejected the proposed plea agreement. According to Rule 11(e)(1) of the West Virginia Rules of Criminal Procedure, "[t]he attorney for the state and the attorney for the defendant ... may engage in discussions with a view toward reaching an agreement[.]" Further, "[i]f a plea agreement has been reached by the parties .... the court may accept or reject the agreement[.]" Rule 11(e)(2) of the West Virginia Rules of Criminal Procedure. Pursuant to Rule 11(e)(4) of the same Rules of Criminal Procedure,

[i]f the court rejects the plea agreement, the court shall, on the record, inform the parties of this fact, advise the defendant personally in open court or, on a showing of good cause, in camera, that the court is not bound by the plea agreement, afford the defendant the opportunity to then withdraw the plea, and advise the defendant that if he or she persists in a plea of guilty or plea of nolo contendere, the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement.

■ In light of the foregoing, we have expressly held that " 'West Virginia Rules of Criminal Procedure, Rule 11, gives a trial court discretion to refuse a plea bargain.' Syllabus Point 5, *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984)." Syl. pt. 2, *Myers v. Frazier*, 173 W.Va. 658, 319 S.E.2d 782 (1984). Further, "[u]nder Rule 11(e)(2) of the West Virginia Rules of Criminal Procedure, the power is vested in the circuit court to accept or reject a plea agreement[.]" Syl. pt. 3, in part, *id.* As previously recognized, there is no constitutional right to plea bargain or to have the plea bargain accepted by the court. *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *Myers v. Frazier*, 173 W.Va. 658, 319 S.E.2d 782 (1984); *State v. Guthrie*, 173 W.Va. 290, 315 S.E.2d 397 (1984); *United States v. Stamey*, 569 F.2d 805 (4th Cir.1978); *United*

*States v. Jackson,* 563 F.2d 1145 (4th Cir. 1977).

■ As previously recognized, a trial court has discretion whether to receive a plea agreement. In deciding whether a trial court has acted properly in accepting or rejecting a plea agreement, we are guided by our earlier holding that "[a] court's ultimate discretion in accepting or rejecting a plea agreement is whether it is consistent with the public interest in the fair administration of justice." Syl. pt. 4, *Myers v. Frazier,* 173 W.Va. 658, 319 S.E.2d 782. Further,

> [a] primary test to determine whether a plea bargain should be accepted or rejected is in light of the entire criminal event and given the defendant's prior criminal record whether the plea bargain enables the court to dispose of the case in a manner commensurate with the seriousness of the criminal charges and the character and background of the defendant.

Syl. pt. 6, *id.*

■ Applying these legal principles to the facts of this case, the record reveals that the State sought Mr. Waldron's assistance in prosecuting Mr. Mullins. Mr. Waldron was incarcerated when the prosecuting attorney represented to the trial judge that a plea agreement had been reached,[4] and that Mr. Waldron, as part of the agreement, offered to assist the police. Mr. Waldron complied with each request asked of him: he helped locate evidence, he gave a voluntary statement, and he provided a blood sample.

In the present case, the parties did not obtain the trial court's approval prior to entering into the agreement. Significantly, at the hearing when the state asked for Mr. Waldron's release pursuant to the plea agreement, the court was not informed of the parameters of the agreement, or that it consisted of a plea to a misdemeanor charge. Notably, taking into account the prior felony record of the defendant, and the seriousness of his current crimes, including one death and two malicious assaults, the trial court was within its discretion to refuse a misdemeanor plea. Importantly, the circuit judge stated it was the first time in his nineteen years on the bench that he had rejected a plea agreement.[5] Therefore, the trial court did not abuse its discretion in refusing the plea agreement.

### B. Admission of Photographs

Mr. Waldron's second assignment of error deals with the introduction into evidence of gruesome photographs that he avers were prejudicial and inflammatory and, therefore, violated Rule 403 of the West Virginia Rules of Evidence. The State argues that the court specifically disallowed certain pictures,

---

4. The record is clear, however, that the trial court was never informed of the terms of the plea agreement prior to agreeing to release Mr. Waldron into the custody of the State Police. Most importantly, the trial court was not informed that the plea agreement consisted of a misdemeanor plea. We are concerned, however, regarding the terms of Mr. Waldron's release from jail to provide assistance to law enforcement. The record is not clear as to what was said prior to that release, nor is it clear as to whether Mr. Waldron was advised that the circuit court's approval of his release would not obligate the court to accept his plea agreement. In future situations, it is preferable that when a court is asked to release a defendant pursuant to a plea agreement, that the trial court bring the defendant into court and make a record that the defendant was advised that such a release would not necessarily lead to a ratification of the plea agreement. However, this issue was not raised below or on appeal thereby limiting our review to plain error. " 'To trigger application of the plain error doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation

of the judicial proceedings.' Syl. pt. 7, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995)." Syl. pt. 2, *State v. Myers,* 204 W.Va. 449, 513 S.E.2d 676 (1998). Additionally, "[t]he plain error rule presupposes that the record is sufficiently developed to discern the error." *State v. Spence,* 182 W.Va. 472, 481, 388 S.E.2d 498, 507 (1989). Because the record is not sufficiently developed on this issue and because we find no error that is plain, we will not invoke the plain error doctrine to review the decision.

5. The trial court also stated that he would not accept anything less than a felony plea. While Mr. Waldron argued that, by this statement, the judge improperly participated in the plea negotiations, we cannot agree. A review of the March 3, 2003, plea hearing transcript reveals that the judge was merely stating his reasons for not accepting the plea. We have specifically recognized that a court may discuss the specific reasons for rejecting a negotiated plea. *State ex rel. Simpkins v. Harvey,* 172 W.Va. 312, 305 S.E.2d 268 (1983) *overruled on other grounds by State ex rel. Hagg v. Spillers,* 181 W.Va. 387, 382 S.E.2d 581 (1989).

and that the admitted pictures were not gruesome or inflammatory to the extent that it would bring unfair prejudice to the jury.

■■■ We note that "[t]he admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence."[6] Syl. pt. 8, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). The *Derr* case further explained as follows:

> Although Rules 401 and 402 of the West Virginia Rules of Evidence strongly encourage the admission of as much evidence as possible, Rule 403 of the West Virginia Rules of Evidence restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence.

Syl. pt. 9, *id.* Moreover,

> Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct,

and the trial court's discretion will not be overturned absent a showing of clear abuse.

Syl. pt. 10, *id.*

During the pretrial hearing held March 22, 2004, Mr. Waldron objected to ten specific photographs on the basis that they were gruesome, inflammatory, and cumulative. Other photographs were stipulated to by both parties, and were deemed admissible by the trial court. The trial court viewed the objectionable photographs and, of the ten targeted by Mr. Waldron, the trial court admitted five. In so ruling, the circuit court stated:

> And the Court finds that the five, which the State has selected out of the ten which the Defendant objected to, they are not gruesome or inflammatory to the extent that it would bring about unfair prejudice to the jury and that they are not cumulative now that the Court has reduced them down.

■■■ The Rule 403 analysis begins with a finding of whether a photograph is relevant. If relevant, then and only then is its probative value weighed against the prejudicial nature of the exhibit. In the case at bar, we find that the photographs were relevant and, further, that they were not in any way unfairly prejudicial. Our own review of the objectionable photographs[7] reveals one depicting the decedent, Chantel Webb, when she was alive. The record also contains pictures of the same victim on a morgue table, as well as close-up pictures of shot wounds.

---

**6.** Rules 401 through 403 of the West Virginia Rules of Evidence provide:

**Rule 401. Definition of "relevant evidence."**
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Rule 402. Relevant evidence generally admissible; irrelevant evidence inadmissible.**
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of West Virginia, by these rules, or by other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible. (As amended by order entered June 15, 1994, effective July 1, 1994.)

**Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.**
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**7.** We note that Mr. Waldron did not direct his objections to any specific photograph by exhibit number. Therefore, we rely on his description of the objectionable pictures and match them accordingly with the photographs supplied in the record.

We also have been supplied pictures of blood puddles on pavement.[8]

■ Moving to the arguments regarding the admitted photographs, we have previously held that it is within the discretion of a trial judge to admit photographs depicting trails of blood and the body of a shooting victim. *See State v. Wheeler*, 187 W.Va. 379, 419 S.E.2d 447 (1992). Moreover, in *State v. Young*, 173 W.Va. 1, 311 S.E.2d 118 (1983), we recognized that a body of a victim after autopsy procedures may be gruesome; however, where the body has not undergone such procedures, the picture is not gruesome. *Accord State v. Harper*, 179 W.Va. 24, 365 S.E.2d 69 (1987). We have also relied on the amount of blood and gore in the picture, and in whether the body is pictured with unnatural facial positions or contortions in determining that the photograph is not gruesome and in determining whether a photograph is prejudicial. *See State v. Parsons*, 181 W.Va. 56, 380 S.E.2d 223 (1989). Moreover, pictures that do not depict excessive blood and gore, but show puncture wounds are relevant to corroborate the State's testimony. *See State v. Haddox*, 166 W.Va. 630, 276 S.E.2d 788 (1981). In regards to the prejudicial impact of the picture of the decedent taken during her life, we are guided by the proposition that the decedent was a murder victim and had to be identified. Such pictures have been found relevant according to *United States v. Grandison*, 780 F.2d 425 (4th Cir. 1985).[9]

■ The pictures were clearly relevant to identify the victims, the nature and location of the wounds, and the scene of the crime. Moreover, the photographs were not prejudicial. In all of the photographs, the wounds were free of large amounts of blood and gore, and clean penetration wounds were visible. A careful examination of the morgue pictures illustrates that no pictures depict the victim after having undergone autopsy procedures. One picture is a photograph of the victim from the neck up, and reveals no gunshot wounds. While some blood is present, it is not abnormally bloody or full of gore. Another picture shows the victim on the table, but shows no unusual contortions or facial expressions. Another picture shows the victim on her side and reveals the back wound that was not visible in any other pictures. The exhibits were not hideous, ghastly, horrible, or dreadful. They were relevant and probative in showing the jury the condition, identity, and location of wounds on the body, and any speculative prejudicial effect was outweighed. The photographs simply were not of the nature to arouse passion and cause the jury to decide this case on improper grounds. Here, we refuse to interfere with the trial court's exercise of its discretion in admitting the photographs or in allowing testimony regarding the photographs.

### C. Destruction of Confiscated Notes

Mr. Waldron's third assignment of error concerns the trial judge's destruction of notes that were confiscated from an observer. This alleged error may be easily resolved. The record reveals that an observer was seen taking notes. Mr. Waldron avers that the observer took notes during the testimony of certain witnesses with the alleged intent of assisting a state's witness who was to testify later in the trial.[10] The trial court noticed the note-taking and confiscated the notes and disposed of them. Mr. Waldron argues that he was denied his right to review, examine, and preserve potential witness tampering evidence because the trial court destroyed the evidence. The State argues that Mr. Waldron never asked to see

---

8. It appears that the bloody pavement pictures were not objected to, but rather, the objection is more to the manner in which the prosecutor was allowed to talk about the case as a "bloody" case. We dismiss this argument summarily as the case was, in fact, a murder case involving three shooting victims. The trial court was well within its discretion to allow argument and testimony about the blood inherent in such actions.

9. We recognize that Mr. Waldron argues that this photograph was introduced in an inflammatory manner. A review of the record transcript illustrates that the decedent's boyfriend was asked to identify the picture. The witness further testified to initials on the back of the picture and a writing he had personally written on the back of the photo. Such testimony does not rise to the level of inflaming the jury, but rather, served as this witness' verification that he was familiar with this picture.

10. There is no allegation that the prosecution was involved in the note-taking process.

the confiscated notes, nor did he ask the trial court to preserve them.

We first note that no objection was made to the confiscation or disposal of the notes during trial. We have previously stated that "[w]hen a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time." *State v. Salmons*, 203 W.Va. 561, 569, 509 S.E.2d 842, 850 (1998) citing *State v. LaRock*, 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996). "It must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely." *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996).

■ The first time an objection was made occurred during the post-trial motions, after the court had disposed of the notes. An objection at this time did not afford the circuit court any opportunity to correct any perceived error. The circuit court heard the post-trial arguments, and found that there was little or no evidence describing what was in the notes. The circuit court also found that when the intended recipient of the confiscated notes testified, Mr. Waldron was afforded every opportunity to impeach her credibility. Significantly, because the notes were confiscated, they were not available for the speculative purpose of assisting a subsequent witness. Therefore, the trial court's destruction of the notes did not prejudice Mr. Waldron, and the timing of Mr. Waldron's objection waived his right to complain at a later time.

### D. Trial Court's Remarks and Instructions to the Jury

Mr. Waldron finally argues that he was denied a fair trial when the trial court issued an "Allen charge" by telling the jury that the court was "duty bound" to finish the trial by a certain date and time. Mr. Waldron also avers that the trial court rushed the proceedings and made remarks throughout the entire trial leading the jury to believe that they were forced to render a verdict. The State argues that the judge committed no errors in his remarks or his charge to the jury.

■ The first portion of Mr. Waldron's argument seems to be an allegation that the trial court pressured the jury to hurry and that the court stated the jury must reach a decision by a certain time. Our review of the trial transcript reveals that the trial judge did, indeed, relay to the jury the date by which he anticipated the case to finish. Further, there were certain days that the judge requested of the jury members if they could stay late after the five o'clock hour. However, our impression of the record was not that the judge was forcing a time frame and a quick verdict on the jury. Rather, the trial judge was asking the jury members if they could commit to such a time frame and requesting input on the availability of their schedules. We fail to see how the trial court's recognition of possible time constraints can be construed as anything other than an attempt to seat a proper jury who could preside over the matter free from scheduling issues.

■ The second portion of Mr. Waldron's argument revolves around the "Allen charge" [11] that was given to the jury in the midst of their deliberations. Mr. Waldron did not object to any of the charge during trial; however, he now asserts error on appeal. We first note that "[n]o party may assign as error the giving or the refusal to give an instruction or the giving of any portion of the charge unless that party objects thereto ... but the court or any appellate court may, in the interest of justice, notice plain error in the giving or refusal to give an instruction[.]" West Virginia Rules of Criminal Procedure, Rule 30. Further, where a party does not object to the giving of an Allen charge, he must show plain error in order to obtain a reversal of the conviction.

---

11. "The *Allen* charge, often called the 'dynamite charge,' is a supplemental instruction given to encourage deadlocked juries to reach agreement." Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure*, Vol. II, page 257 (2nd Ed.1993). The name for this particular instruction originated from the case of *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

*See United States v. Russell,* 971 F.2d 1098, 1107 (4th Cir.1992); *State v. Clark,* 175 W.Va. 58, 331 S.E.2d 496 (1985).

 In the present case, the jury deliberated for four and one-half hours. The trial court then instructed them as follows:

Ladies and Gentlemen of the Jury, the Court instructs you that you have informed the Court of your inability to reach a verdict in this case.... At the outset, the Court wishes you to know that, although you have a duty to reach a verdict if that is possible, the Court has neither the power nor the desire to compel agreement upon a verdict.

The purpose of these remarks is to point out to you the importance and desirability of reaching a verdict in this case, provided, however, that you, as individual jurors, can do so without surrendering or sacrificing your conscientious scruples or personal convictions. You will recall that, upon assuming your duties in this case, each of you took an oath. That oath places upon each of you, as individuals, the responsibility of arriving at a true verdict upon the basis of your own opinion and not merely upon acquiescence in the conclusions of your fellow jurors.

However, it, by no means, follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to reach a verdict by a comparison of views and by a consideration of the proofs of your fellow jurors.

The jury returned its verdict within an hour of hearing the above charge. While Mr. Waldron argues that this Allen charge was improper, we note that the charge is not an original Allen charge. The instruction is a modified Allen charge and is in line with the instruction approved by this Court in *State v. Blessing,* 175 W.Va. 132, 331 S.E.2d 863 (1985) (per curiam). We also note that the instruction addressed the jury as a whole and was not improperly directed at either the majority or the minority. *See Levine v. Headlee,* 148 W.Va. 323, 134 S.E.2d 892 (1964).

The judge allowed the jury to deliberate for over four hours before giving the modified Allen charge. Moreover, within that charge, no verdict was coerced and no major-

ity or minority grouping was singled out for admonishment. We find no error in the instruction as given. Significantly, because Mr. Waldron did not object to the instruction at the time it was given, he was required to show clear error on appeal, and he failed to do so.

## IV.

### CONCLUSION

For the foregoing reasons, we affirm the July 23, 2004, sentencing order entered by the Circuit Court of McDowell County.

Affirmed.

Chief Justice ALBRIGHT and Justice STARCHER dissent and reserve the right to file dissenting opinions.

ALBRIGHT, Chief Justice, dissenting:

(Filed Dec. 16, 2005)

I respectfully dissent from the majority opinion of this Court. I believe that the lower court erred by admitting into evidence several gruesome photographs, to the undue prejudice of the Appellant in the circumstances of this case.

The majority quite properly initiates its discussion of the admission of the subject photographs with a recitation of the pertinent syllabus points written by Justice Cleckley in *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994). In its analysis of the issue, however, the majority deviates from the standards specified in *Derr* and relies upon a myriad of opinions issued by this Court *prior* to the 1994 *Derr* opinion. *Derr* substantially altered the manner in which the admissibility of such photographs is analyzed and specifically overruled *State v. Rowe,* 163 W.Va. 593, 259 S.E.2d 26 (1979), which had been accepted as the primary model for analyzing the admissibility issue prior to this Court's *Derr* opinion. In *Derr,* Justice Cleckley recognized that *Rowe* had been decided before the adoption of the West Virginia Rules of Evidence and, therefore, did not take into account the changes in our evidentiary jurisprudence made by those rules. Justice Cleckley explained as follows at syllabus point six: "Whatever the wisdom and

utility of *State v. Rowe,* 163 W.Va. 593, 259 S.E.2d 26 (1979), and its progeny, it is clear that the *Rowe* balancing test did not survive the adoption of the West Virginia Rules of Evidence. Therefore, *State v. Rowe, supra,* is expressly overruled because it is manifestly incompatible with Rule 403 of the West Virginia Rules of Evidence." 192 W.Va. at 168, 451 S.E.2d at 734. Further, in pertinent part of syllabus point seven, the *Derr* Court explained: "These rules constitute more than a mere refinement of common law evidentiary rules, they are a comprehensive reformulation of them." *Id.*

Thus, utilizing the specific *Derr* standards rather than relying upon prior general case law, the issue of admissibility of gruesome photographs is governed by Rule 401 and Rule 403 of the West Virginia Rules of Evidence, and exclusion of photographs is justified if the prejudicial effect of the gruesomeness outweighs the probative value of the photographs. Syllabus point nine of *Derr* specifies that even relevant evidence may be "excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence." *Id.* Syllabus point ten of *Derr* explains that the relevancy of the photograph is to be determined "on the basis of whether the photograph is probative as to a fact of consequence in the case." *Id.*

Accordingly, the probative value of tendered photographic evidence should be evaluated with regard to its possible impact on any "fact of consequence" in the case. In *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court explained that in order to perform a "Rule 403 balance, we must assess the *degree* of probity of the evidence, which, in turn, depends on its relation to the evidence and strategy presented at trial in general." 194 W.Va. at 682, 461 S.E.2d at 188. That reasoning underscores the *Derr* syllabus point eight holding that "[t]he admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence." 192 W.Va. at 168, 451 S.E.2d at 734. In *State v. Copen,* 211 W.Va. 501, 566 S.E.2d 638 (2002), for instance, the photographs were determined to be probative because "there was some question as to intent and malice, and intent and malice were plainly issues in the case when the photographs were offered into evidence." 211 W.Va. at 505, 566 S.E.2d at 642.

In the present case, the record does not disclose that the court below conducted the balancing exercise; on the record, the trial court simply permitted the introduction of five of the ten photographs tendered without significant explanation. I believe that the five photographs admitted were not probative of any "fact of consequence in the case," and it is clear that the lower court made no such finding incident to admitting them into evidence. There was no question that the victim was deceased and that she had been shot by Doug Mullins while the Appellant served as a lookout. The position of the victim was not in question; angles of bullet wounds were not in dispute; and the identity of the shooter had been established. Rather, it appears from the record that the sole contested issue in the trial was the level of the Appellant's participation in the homicide: Was he an unwitting presence or an active participant, e.g., as a lookout?

Thus, the value of the photographs, as a means of assisting the jury in determining the truth or falsity of any fact *of consequence,* was minimal or non-existent. The probity of the evidence, which as *Derr* explained depends on the relation to the evidence and strategy at trial, was likewise minimal or non-existent. It appears that the sole object served by the introduction of these photographs was to elicit an emotional response from the jury, to provoke sympathy toward the victim and indignation toward the Appellant. As the *Guthrie* Court wisely observed:

> The mission of Rule 403 is to eliminate the obvious instance in which a jury will *convict because its passions are aroused rather than motivated by the persuasive force of the probative evidence.* Stated another way, the concern is with any pronounced tendency of evidence to lead the jury, often for emotional reasons, to desire to convict a defendant for reasons other than the defendant's guilt.

194 W.Va. at 682–83, 461 S.E.2d at 188–89 (emphasis supplied).

As this Court astutely remarked in *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978), "the introduction of photographs portraying a crime, the circumstances of which are basically stipulated, is always risky because the prejudicial effect may be so far in excess of any legitimate probative value as to preclude their admission." 161 W.Va. at 396, 242 S.E.2d at 472. It may also be observed that merely reducing the number of photographs to be admitted does not relieve the trial court of the obligation to conduct the necessary balancing test.

For the reasons discussed, I believe that the prejudicial effect of the five photographs introduced easily outweighed their probative value and that their introduction constituted reversible, prejudicial error, entitling the Appellant to a new trial. I therefore respectfully dissent.

I am authorized to state that Justice Starcher joins in this dissenting opinion.