696 S.E.2d 45

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Roshawn PANNELL, Defendant Below, Appellant.**

**State of West Virginia, Plaintiff Below, Appellee**

v.

**Jamie Turner, Defendant Below, Appellant.**

**Nos. 35226, 35292.**

Supreme Court of Appeals of West Virginia.

Submitted April 13, 2010.

Decided June 3, 2010.

---

Richard W. Weston, Huntington, WV, for the Appellant, Roshawn Pannell.

Kerry Alexander Nessel, Nessel Law Firm, Huntington, WV, for the Appellant, Jamie Turner.

R. Christopher Smith, Attorney General's Office, Charleston, WV, for the Appellee.

PER CURIAM:

Through this consolidated appeal, Appellants Roshawn Pannell and Jamie Turner[1] challenge their respective convictions on three counts of first degree robbery and one count of fleeing following a jury trial. As grounds for seeking either an acquittal or a new trial, Appellants jointly assert that the trial court coerced a guilty verdict by pressuring the jury to reach its verdict and thereby violated their right to a fair trial.[2] Both Appellants argue that one count of their respective robbery convictions was improper because no money or personal property was stolen from the alleged victim. Mr. Pannell separately contends that the evidence was insufficient to establish that he committed first degree robbery or the offense of fleeing. Upon our review of these assignments of error in conjunction with the record, we conclude that the trial court did not commit error and, accordingly, we affirm the trial court's denial of Appellants' respective motions seeking an acquittal or a new trial.

### I. Factual and Procedural Background

On July 12, 2006, three individuals were robbed at gunpoint around 3 a.m. as they walked back to their fraternity house in Huntington, West Virginia. The victims, Christopher Chiles, Andrew Chiles, and Marco Cipriani, had been at a local bar celebrating the twenty-first birthday of Andrew Chiles. As they approached an intersection while walking eastbound on Fifth Avenue, they saw an African-American male approximately five feet eleven inches tall jumping up and down in an excited manner.[3] This man was originally described as being dressed in all black[4] and having panty hose over his face but at trial, two of the victims testified that he had a green "Du-Rag" on his head.

1. Mr. Turner submitted his appeal to this Court based on briefs, opting not to participate in the oral argument of this case.

2. *See In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (recognizing that "[a] fair trial in a fair tribunal is a basic requirement of due process").

3. The individual was described by one victim as "someone who was ... trying to ... pump ... [himself] up" and by another as though he was "get[ting] psyched up" in the "way that people do before basketball games."

4. Both assailants were described as wearing dark tee shirts and dark shorts or jeans.

Just then, a masked individual[5] rounded the corner, pointed a handgun at them, and demanded "Give me everything you have got." The three alleged victims dropped their wallets or the cash they had on them on the ground. The gun wielding perpetrator then ordered the victims to "take off," and they ran to their fraternity house and called 911.

A few minutes after the 911 call was made, a patrol officer saw two men who matched the description of the perpetrators (African-American males dressed in all black with pantyhose over their faces) in a red car traveling away from the area of the robbery. Officer Sid Hinchman testified that he turned around to follow the vehicle after the men, who were wearing objects on their heads that did not appear to be hats, turned their heads in an exaggerated fashion and then immediately made a left turn onto Thirteenth Street.[6] When Officer Hinchman turned his cruiser around, he saw the same red vehicle parked with both doors open and no passengers in sight. When he approached the car, a red Ford Escort, Officer Hinchman noticed that the engine was still running. In searching the vehicle, he discovered a black semi-automatic handgun with a fully-loaded clip. A subsequent inspection of the car revealed a dark piece of cloth with slits in it on the driver's side floorboard by the door and a green cloth described as a "du-rag" lying on the floorboard on the passenger side of the vehicle.

Having heard the dispatch put out after the 911 call,[7] Officer Scott Ballou of the Marshall University Police Department observed an African-American in a dark shirt and jeans on the railroad tracks. Because he matched the description from the dispatch, Officer Ballou stopped James Turner and secured him with handcuffs. Patrolman Eddie Prichard, Jr., of the Huntington Police Department traveled on foot to Eighth Avenue after hearing Sergeant John Ellis state on the radio that two African-Americans were running east on the railroad tracks. Officer Prichard saw an African-American male in a white tee-shirt[8] and dark jeans jump from an underpass to a sidewalk heading south towards him. After directing that individual, Roshawn Pannell, to stop, he took custody of him.[9] No money was found on Mr. Pannell, but three wads of money were recovered from Mr. Turner's pockets.[10] Later that same day when a show-up was held, the alleged victims were unable to positively identify their assailants.[11]

When this matter went to trial on August 1, 2007, the State sought to prove its case with the testimony of the alleged victims and the various city and university police officers who were involved in the case.[12] David Castle, a crime scene investigator for the Huntington Police Department, offered forensic testimony at the trial. He testified that while the .45 caliber High Point gun found in the car did not reveal any identifiable fingerprints, Mr. Pannell's fingerprints were discovered on a Lipton Tea bottle discovered in the red Ford Escort and Mr. Turner's fingerprint was identified on a 7–Eleven plastic bag also found in the car. Mr. Pannell's fingerprint was also found on the rearview mirror.

5. The testimony at trial offered by the victims was that the perpetrator wielding the gun wore a dark mask with eye slits that resembled a loose-fitting sleeve over his face.

6. The police officer testified that even the turn was suspicious as cars do not routinely turn onto this street at night

7. The dispatch was transmitted at approximately 3:14 a.m.

8. Sergeant Ellis found a black tee-shirt thrown up underneath a train car when he was pursuing the suspects on the railroad tracks.

9. This apprehension occurred six or seven minutes after the dispatch was sent.

10. Of the three wads of money, one totaled $48; another $6; and the third $7. At trial, Marco Cipriani testified he had $20 taken from him and Chris Chiles testified that he had $29 taken from him. Andrew Chiles did not have any money taken from him.

11. While the victims were unable to identify their assailants because their faces were covered or turned from them at the time of the robbery, they did testify that Appellants were of the same physical stature as their assailants.

12. Those officers included Jason Young, who participated in the show-up; Scott Ballou; Sid Hinchman; Eddie Prichard, Jr.; and John Ellis.

The only witness the defense offered at trial was Mr. Turner.[13] According to Mr. Turner, Mr. Pannell picked him up in the red Ford Escort shortly after Mr. Turner left a Huntington nightclub.[14] In explanation of why Appellants turned their heads when Officer Hinchman drove by, Mr. Turner testified that it was to avoid the bright lights of the patrol car. When Appellants saw the patrol car make a U-turn shortly after it passed them, Mr. Turner stated that they exited the vehicle and fled on foot until their capture. The reason for their flight, according to Mr. Turner, was an outstanding warrant for drug-related charges[15] pending against Mr. Turner. Mr. Turner testified that he had known Mr. Pannell for about one year and that Mr. Pannell had just been released from jail on the day prior to the alleged robbery.[16] Maintaining that he had no involvement in the subject robbery, Mr. Turner also refused to implicate Mr. Pannell in the robbery.

On Friday, August 3, 2007, the jury began its deliberations around 1:05 p.m. After picking a foreperson, the jury requested a lunch break. Following that break, the deliberations resumed at 2 p.m. The jury informed the trial court at 4:49 p.m. that they were not making progress. They inquired as to how long they could deliberate that day and also whether they could continue their deliberations on Monday. Although the trial judge indicated to the jury that they could deliberate as long as they wished on Friday, he informed them that he was leaving on vacation the next day. The judge remarked additionally that one of the jurors, James Blankenship, was scheduled to depart for vacation on Saturday.[17] The trial judge suggested that the jury take a dinner break and then continue their deliberations. At 5:07 p.m., the trial judge gave a modified *Allen* charge[18] and the jury resumed its deliberations at 5:13 p.m. The jury returned its verdict at 7:15 p.m., convicting both Appellants of all charges.[19] The trial court then required the jury to answer an interrogatory concerning whether Mr. Turner had used a firearm in the commission of the crime. The jury quickly answered the interrogatory in the affirmative.

Appellants were both sentenced to concurrent sentences of sixty years in the state penitentiary for robbery plus a consecutive six-month sentence in the regional jail for fleeing. Separate motions for new trials were filed by Appellants' trial counsel.[20] After those motions were denied, Appellants filed *pro se* notices of appeal on November 8, 2007. Counsel was later appointed to help assist Mr. Turner and Mr. Pannell with the filing of their appellate petitions. Present defense counsel filed motions for reconsideration of sentence on behalf of their respective clients, and the trial court denied those motions on March 17, 2008.[21] By order entered on October 29, 2009, this Court consolidated the appeals filed by Appellants for purposes of argument, consideration, and decision.

## II. Standard of Review

With regard to Appellants' allegation that the verdict was coerced, we have ruled that: "[w]hether a trial court's instructions constitute improper coercion of a verdict necessarily depends upon the facts and circumstances of the particular case and cannot be determined by an general or definite

---

13. Mr. Pannell did not testify at trial.

14. Mr. Turner testified that he went to the nightclub at 1 p.m.; he did not testify regarding what time he left the nightclub.

15. The charges were pending in Logan County, West Virginia.

16. Mr. Turner testified that Mr. Pannell was aware of the pending drug charges against Mr. Turner, despite Mr. Pannell's release from jail the day before the robbery.

17. There were no alternate jurors.

18. *See Allen v. U.S.*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

19. They were each convicted of three counts of first degree robbery and one count of fleeing.

20. Mr. Pannell's trial counsel filed a motion seeking a new trial on August 9, 2007, and Mr. Turner's trial counsel filed a similar motion on October 9, 2007.

21. The trial court resentenced each of the Appellants by order of February 10, 2009, thereby extending the time period provided for the perfection of the subject appeals.

rule." Syl. Pt. 2, *State v. Spence,* 173 W.Va. 184, 313 S.E.2d 461 (1984) (citations omitted). As to Appellant Pannell's contention that the evidence was insufficient to establish that he was guilty of first degree robbery or fleeing, the following standard governs:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). With these standards in mind, we proceed to determine whether the trial court committed error.

### III. Discussion

#### A. Coerced Jury Verdict

■ Appellants collectively assert that the trial court coerced the jury to reach its verdict in a hurried manner. As we recognized in *Spence,* the issue of whether a trial court improperly coerced a verdict "necessarily depends upon the facts and circumstances of the particular case and cannot be determined by any general or definite rule." 173 W.Va. at 184, 313 S.E.2d at 462, syl. pt. 2; *see Jenkins v. U.S.,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (recognizing that entire trial record "in its context and under all the circumstances of th[e] case" must be reviewed to determine if trial judge's statements, questions, and instructions amounted

to coercion). In this case, Appellants complain not about the judge's instructions *per se* but about his various remarks to the jury concerning time-related issues.

In *Spence,* this Court considered the effect of the trial judge's temporal remarks to the jury and concluded that his comments "amounted to improper coercion of the jury to reach a verdict within a time limit set by the court." 173 W.Va. at 186, 313 S.E.2d at 463. The statements made by the trial judge during the trial in *Spence* included assertions such as "we are going to take as much evidence as we can;" "I'll stick to my promise, you will be out of here by noon, tomorrow;" and "I don't want to hold you unduly but I need your help." 173 W.Va. at 186, 313 S.E.2d a 463–64. After the jury had deliberated for less than an hour in *Spence,* the trial court called them into the courtroom to inquire about their progress. When the trial judge learned from the foreperson that " 'no substantial progress' " had been made, he instructed the panel:

> "Now the Court is not ordering you, but you have to reach a verdict. I am merely telling you what is contemplated in the eyes of the law, if it is possible to do it.
>
> "I am going to give you ladies and gentlemen a few more minutes to see if you can resolve your differences by discussing them and if you can arrive at a verdict."

173 W.Va. at 186, 313 S.E.2d at 464. Concluding that the trial judge's comments in *Spence* "were designed to have the effect of expediting the trial," we reversed and remanded the case for a new trial. 173 W.Va. at 186, 313 S.E.2d at 463.

Appellants contend that Judge Ferguson made improper remarks to the jury, analogous to what occurred in *Spence,* in an attempt to coerce the panel to reach its verdict in an accelerated fashion. Our review of the record in this case reveals that the potential duration of the trial was of some concern to the trial judge.[22] The trial court initially told the empaneled jury on Wednesday that the trial would last two days. The court inquired

---

22. Appellant Pannell suggests that his counsel's comment that the trial "will go past today" was an attempt to inform the trial judge that the case

could take longer than the two days the judge was anticipating for trial.

of the jury as to whether any of the panel had a problem with returning on Thursday for a second day of trial and no one expressed any issue with appearing for jury duty on Thursday. One of the jurors did indicate, however, that he would have a problem if the trial went longer than Friday, as he was leaving on vacation on Saturday.[23]

The first time the trial judge expressed concern to the jury about the actual duration of the trial occurred, according to Appellants, as the jury was leaving for lunch on Thursday. Noting that some members had been late in returning the day before, the trial court advised the jury that they should return in a punctual fashion. Appellants contend that this directive to be timely signaled to the jurors that the trial court was anxious for the trial to reach its conclusion.

The issue of time was again presented when the jury sent out a note at 4:49 on Friday afternoon indicating that they had yet to reach a verdict, asking how long they could deliberate that day, and inquiring whether they could resume their deliberations on Monday. When the jury was brought into the courtroom, the trial court addressed the question of how late they could deliberate on Friday by stating, "that's up to you all. We will stay here as long as you all want to stay." Responding to the related question of whether they could come back on Monday, the trial court informed the jury that he was "leaving for vacation in the morning." After commenting that he could have another judge take over for him on Monday, the trial judge noted a more troubling issue—the fact that Juror Blankenship was similarly slated to leave on his vacation the next day. Because there were no jury alternates and because defense counsel did not want to proceed with less than twelve jurors, the judge suggested that they place an order for food to be brought in, which they did, and continue to work toward reaching a unanimous verdict. After giving the jurors a ten-minute break, the trial court gave the jury what it referred to as a modified *Allen* charge.[24]

The jury resumed its deliberations at 5:13 p.m. At 5:54 p.m., the jury sent out a note asking three evidentiary-related questions.[25] When the judge called the panel into the courtroom, he indicated that there were no written answers to what the jury had requested. At 5:58 p.m., the jury retired to the jury room to continue their deliberations and

23. This was Mr. Blankenship.

24. The charge was as follows:

You have informed the Court of your inability to reach a verdict in this case. The Court does not wish to know, and you are not to indicate, how you stand or whether you entertain a predominant view.

At the outset the Court wishes you to know that although you have a duty to reach a verdict, if that is possible, the Court has neither the power nor the desire to compel agreement upon a verdict.

The purpose of these remarks is to point out to you the importance and the desirability of reaching a verdict in this case, provided, however that you as individual jurors can do so without surrendering or sacrificing your conscientious scruples or personal convictions.

You will recall that upon assuming your duties in this case each of you took an oath. That oath places upon each of you as individuals the responsibility of arriving at a true verdict upon the basis of your own opinion and not merely upon acquiescence in the conclusions of your fellow jurors.

However, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to reach a verdict by a comparison of views and by a consideration of the proofs with your fellow jurors.

During your deliberations you should be open-minded and consider the issues with proper deference to and respect for the opinions of each other and you should not hesitate to re-examine your own views in the light of such discussions.

You should consider also that this case must at some time be terminated; that you are selected in the same manner and from the same source from which any future jury must be selected; that there is no reason to suppose that the case will ever be submitted to twelve persons more intelligent, more impartial or more competent to decide it, or that more or clearer evidence will ever be produced on one side or the other.

You may retire now, taking as much time as is necessary for further deliberations upon the issues submitted to you for determination.

25. Earlier in the deliberations process, at 3:23 p.m., the jury had submitted a note asking the court for a CD player; a transcript of the 911 call; a transcript; and witness statements. The jury was given a CD player and the 911 call.

at 7:15 they indicated that they had reached a verdict.

Appellants seek to convince us that the trial judge improperly rushed the jury to reach its verdict. Our review of the record indicates that over a five-hour period (from 2 p.m. til 7:15 p.m.), the jury was engaged in the type of deliberative process contemplated by our system of jurisprudence. *See State v. Hobbs,* 168 W.Va. 13, 37, 282 S.E.2d 258, 272 (1981) (deciding that trial court's instructions "constituted a fair and reasonable effort to stimulate continued deliberation"). The record reveals that the jury carefully considered the evidence adduced at trial, as reflected by the jury's notes, first at 3:23 p.m. and then at 5:54 p.m., through which they asked for specific items of evidence.

While the jury was clearly impelled to keep trying to reach a unanimous verdict late on a Friday afternoon, there was no indication that the trial court was going to refuse to let the panel leave the courthouse if they reached the point of being hopelessly deadlocked. All the trial court did was to ask the jurors, after approximately two and a half hours of deliberations, to see if they could make any further progress on reaching a verdict. As we recognized in *Hobbs,* "[i]t is generally held that when a jury is unable to agree on a verdict, it is within the trial court's discretion to urge an earnest effort to agree, so long as the jurors are free to act without any form of coercion by the trial court." *Id.* at 37, 282 S.E.2d at 272.

In *State v. Blessing,* 175 W.Va. 132, 331 S.E.2d 863 (1985), we considered whether the trial court's giving of an instruction, similar to what Judge Ferguson gave in this case, after only one hour and forty-five minutes of deliberations on a Friday afternoon had a coercive effect on the jury. At the end of the instruction, the trial court remarked further:

> What I'm asking you at this time is to go back in and decide what you want to do as far as deliberating. I want you to deliberate for some other period of time. If you want to go to dinner or if you want to stay or if you want to come back Monday, I will go along with whatever you want to do. I

don't feel at this time you have had sufficient time. I don't want to attempt to coerce you in any way, but I don't feel you have had sufficient time to reach a verdict....

175 W.Va. at 134, 331 S.E.2d at 865. Under the circumstances presented in *Blessing*—a jury reporting impasse after less than two hours of deliberating on a first degree murder charge tried over the course of two days—we determined that the giving of the instruction on the desirability of reaching a verdict was properly geared toward the goal of " 'stimulat[ing] continued deliberation.' " *Id.* at 135, 331 S.E.2d at 866 (quoting *Hobbs,* 168 W.Va. at 37, 282 S.E.2d at 272). In finding that the trial judge's remarks and the supplemental instruction were not coercive, we noted that the trial court did not address his comments solely to the minority members of the jury and he never urged the minority to reconsider its position. 175 W.Va. at 135, 331 S.E.2d at 866.

In the instant case, the fact that both the trial judge and one of the jurors was scheduled for vacation the next day undeniably presented a unique situation.[26] As we recognized in *State v. Waldron,* 218 W.Va. 450, 624 S.E.2d 887 (2005), a trial judge has an inherent need to address both time constraints and the potential for scheduling issues. *Id.* at 459, 624 S.E.2d at 896. The defendant in *Waldron* cited the fact that the trial court gave the jury a date by which he expected the trial to end and inquired of the jurors whether they could stay past 5 p.m. on certain dates as evidence of a coercively-reached verdict. The mere discussion of scheduling issues, as we made clear in *Waldron,* does not give rise to a presumption that the verdict was improperly coerced.

Our review of the record in this case convinces us that the jury approached its decision-making process in a careful and considered fashion. Illustrative of the panel's serious consideration of its task is the fact that the jury sent out notes at both 3:23 p.m. and 5:54 p.m. through which they

---

**26.** Appellants took issue with the fact that the trial judge quipped that he and Juror Blanken-ship might have to ride to the beach together the next day.

sought technical assistance,[27] clarification, or additional items of evidence.[28] The fact that the jury sent out its third note at 5:54 p.m., after the modified *Allen* instruction, indicates that the jury continued to approach its charge of weighing the evidence in a careful manner. That the jury did not simply rush to reach a verdict is further gleaned from the fact that the verdict was returned over two hours after the trial court gave its modified *Allen* charge.[29] When the deliberative process that occurred in this case is viewed in its entirety, we are simply not left with the impression that the trial judge forced "a quick verdict on the jury." *State v. Waldron*, 218 W.Va. at 459, 624 S.E.2d at 896. Accordingly, we do not find that the verdict reached in this case resulted through the trial court's improper coercion of the jury.[30]

### B. Robbery Convictions

■ Appellants maintain that they were each wrongly convicted of one count of first degree robbery based on the fact that no property or money was taken from Andrew Chiles. Andrew Chiles' wallet was recovered by his father at or near the scene of the crime and it was "intact." Officer Prichard testified that Andrew Chiles did not list any amount of money as having been taken from him on his victim's statement. Citing the fact that three separate wads of cash were found on Mr. Turner when he was apprehended, the State contends that "it seems unclear as to whether actual cash was taken from" Andrew Chiles' person.[31]

Regardless of whether Appellants recovered any cash from Andrew Chiles, the State argues that he threw his wallet on the ground in response to the demands of the assailant wielding a gun. Consequently, the wallet was initially removed from his person by one of the two statutory methods for committing the offense of robbery: "threat of deadly force by the presenting of a firearm."[32] W.Va.Code § 61–2–12(a) (2005). As the State observes, the fact that the perpetrator(s) may have discarded the wallet does not negate how the wallet was obtained from Andrew Chiles—by "threat of deadly force by the presenting of a firearm." *Id.* Critically, the robbery statute under which Appellants were convicted includes both robbery and attempt to commit robbery. Accordingly, we do not find the lack of money taken from Mr. Chiles to require a reversal of Appellants' robbery convictions.[33]

---

27. *See supra* note 25 (relating jury's request for CD player).

28. The second note submitted by the jury was at 4:49 when the jury indicated it was not making any progress and inquired as to how long they could deliberate.

29. In *Blessing*, the jury returned with its verdict forty-five minutes after the giving of the supplemental instruction. *See* 175 W.Va. at 134, 331 S.E.2d at 865; *see also U.S. v. Gypsum Co.*, 438 U.S. 422, 462, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (discussing fact that verdict returned soon after supplemental charge "gives rise to serious questions" of jury coercion).

30. We do not find fault with the trial judge's attempt to determine the expected length of the trial on the first day of trial. A trial judge has inherent scheduling authority with regard to the matters assigned to it. *See* Syl. Pt. 2, *B.F. Specialty Co. v. Charles M. Sledd Co.*, 197 W.Va. 463, 475 S.E.2d 555 (1996) (holding that "[t]rial courts have the inherent power to manage their judicial affairs that arise during proceedings in their courts, which includes the right to manage their trial docket"). That scheduling authority necessarily includes the power to manage the docket in conjunction with the judge's planned vacation time.

31. In response to this contention, we observe that Andrew Chiles testified that his recovered wallet had everything in it, including "the money that was left in it."

32. The statute under which Appellants were convicted of first degree robbery provides that:

> Any person who commits or attempts to commit robbery by: (1) Committing violence to the person, including, but not limited to, partial strangulation or suffocation or by striking or beating; or (2) uses the threat of deadly force by the presenting of a firearm or other deadly weapon, is guilty of robbery in the first degree and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than ten years.

W.Va.Code § 61–2–12(a) (emphasis supplied).

33. Appellants complain that the trial court failed to give an attempted robbery instruction. Because Appellants fail to cite to their attempt to introduce a separate attempted robbery instruction or to the trial court's refusal to modify the proffered robbery instruction to provide additionally for attempted robbery, we do not find

## C. Sufficiency of the Evidence

■ Mr. Pannell argues that there is no evidence that he had a gun, said anything to the victims, or committed any of the elements of first degree robbery. Specifically, he contends that he was not close enough to any of the victims to take money against their will and because no money was found on his person, he could not have permanently deprived the victims of their money. As a result, he maintains that the evidence was insufficient to convict him of any robbery charges.

Acknowledging that the jury could only have convicted him of first degree robbery by means of aiding and abetting Mr. Turner, his co-defendant, Mr. Pannell maintains that the evidence introduced at trial fell short of showing that he was acting in furtherance of the crime of robbery. He argues that, at best, the State presented evidence that he was on a corner, jumping up and down, while looking away from the victims at the time of the offense.

Allowing that the trial testimony does not present a crystalline picture of the role each of the Appellants played in the robbery, the State observes that it is certainly not customary behavior for an individual to be jumping up and down on a street corner at 3 a.m. Consequently, the State argues that the jury could have relied on this evidence in conjunction with the other evidence introduced at trial to find Mr. Pannell to be an aider and abetter of Mr. Turner and, therefore, a principal in the first degree. *See* Syl. Pt. 1, in part, *State v. Haines*, 156 W.Va. 281, 192 S.E.2d 879 (1972) (recognizing that "[t]wo or more persons may be charged in an indictment with the commission of a crime, such as armed robbery, as principals in the first degree, when one of the two persons was present, aiding and abetting the other in the commission of the crime"). We agree.

this issue to have been properly preserved for

## D. Fleeing Offense

■ Mr. Pannell argues that because he immediately complied at the point of his apprehension with Officer Prichard's directive to stop, he cannot be found to have committed the offense of fleeing from a law enforcement officer. That offense, as set forth in West Virginia Code § 61–5–17(d) (2005), provides:

> Any person who intentionally flees or attempts to flee by any means other than the use of a vehicle from any law-enforcement officer, probation officer or parole officer acting in his or her official capacity who is attempting to make a lawful arrest of the person, and who knows or reasonably believes that the officer is attempting to arrest him or her, is guilty of a misdemeanor. . . .

The State argues that from the time that Mr. Pannell and his co-defendant exited and abandoned the vehicle, immediately after observing Officer Hinchman's patrol car turn around and began running down the railroad tracks, they were engaged in fleeing a police officer within the meaning of the statute. *See id.* Moreover, the fact that Mr. Pannell was apprehended while in the act of running further indicates he was in the act of fleeing from law enforcement. The State argues that just because Mr. Pannell obeyed the command of Officer Prichard to stop at the point of his apprehension does not negate the earlier acts of fleeing the police. We agree.

Based on the foregoing, the decision of the Circuit Court of Cabell County is affirmed.

Affirmed.