# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-0575** (Kanawha County 17-F-634)

**Carl Tramane Magee,**
**Defendant Below, Petitioner**

**FILED**

**July 30, 2020**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Carl Tramane Magee, by counsel George Castelle, appeals the Circuit Court of Kanawha County's May 24, 2019, sentencing order imposing a life sentence, without mercy, and a consecutive term of incarceration of not less than one nor more than fifteen years for his convictions for murder by arson and burglary by breaking and entering following a jury trial. Respondent State of West Virginia, by counsel Gordon L. Mowen II, filed a response. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On July 23, 2017, a fire was reported at an abandoned house in Charleston, West Virginia. A surveillance camera on a nearby building recorded a person entering the porch of the abandoned house with a gasoline can, a flash of flames a short time later, and then the individual with the gas can running from the porch followed by an individual with their clothes on fire. That second individual, Rachele Jarrett, was hospitalized with severe burns, and she died from her injuries on July 28, 2017.

On July 24, 2017, a breaking and entering was reported several miles from the abandoned home. Officers from the Charleston Police Department ("CPD") arrived at the scene, searched the neighborhood, and located and arrested petitioner. Following his arrest, CPD officers questioned petitioner, and he made incriminating statements regarding the prior day's arson. In

1

September of 2017, petitioner was indicted on eight charges, including first-degree murder, arson, and burglary by breaking and entering.[1]

Due to reported mental illness, petitioner moved for a competency/criminal responsibility evaluation on November 14, 2017, which the circuit court granted by agreed order. Dr. Timothy Saar conducted the examination, and in his report provided to the court on March 29, 2018, he concluded, within a reasonable degree of psychological certainty, that petitioner was not competent to stand trial or accept a plea. Dr. Saar observed that petitioner reported hallucinations and that, although petitioner displayed the ability to comprehend the legal process at times, "delusions and preoccupations significantly interfere with his ability to comprehend such topics in depth." Dr. Saar reported that petitioner's score on a test to determine malingering "was significantly elevated above the recommended cutoff score for the identification of likely feigning," but he cautioned that "the suggestion of probable feigning . . . should not negate the possibility of genuine disability or disorder." In light of his finding on petitioner's competency to stand trial, Dr. Saar did not render an opinion on criminal responsibility.

On April 9, 2018, the parties appeared before the circuit court, and the court stated that it was "going to order, sua sponte, that a forensic evaluation be performed on [petitioner] by Doctor David Clayman." Petitioner did not object to the court ordering a second evaluation, which the court did because Dr. Saar's report raised issues "particularly with respect to the elevated malingering scales." But petitioner did question whether the court could do so sua sponte and asked, "[A]fter I do the research as to the sua sponte issue, if I find that I disagree with the [c]ourt, may I file a motion on that issue?"[2] The court responded in the affirmative.

Petitioner filed no motion on that issue, but he did file a motion on August 8, 2018, requesting that the court find him not competent and transport him to Sharpe Hospital. Petitioner argued that the court failed to make the preliminary finding on competency required by West Virginia Code § 27-6A-3(a)[3] and, instead, sua sponte, ordered the second competency

---

[1] Prior to trial, five of the eight original charges were dismissed to avoid unduly complicating the presentation of evidence. The dismissed counts are not relevant to the issues on appeal.

[2] After the circuit court explained its decision to order a second evaluation, petitioner informed the court, "I think what the statute contemplates is that the [c]ourt enter a temporary order accepting Doctor Saar's findings as the [c]ourt's findings. I'm not sure that remaining in limbo is what is contemplated by the statute." The court did not respond to this specific concern; rather, after further discussion among the parties and court, the focus turned to whether the court could order a second evaluation on its own.

[3] In relevant part, West Virginia Code § 27-6A-3(a) provides that

[w]ithin five days of the receipt of the qualified forensic evaluator's report and opinion on the issue of competency to stand trial, the court of record shall make a

(continued . . .)

2

evaluation. Petitioner further argued that four months had passed since Dr. Clayman was appointed for the second evaluation and he had yet to file a report. Meanwhile, petitioner stated, he remained incarcerated without bond, and as of the date of the filing of the motion, had been held for 375 days. That same day, however, Dr. Clayman submitted his report to the circuit court.

Dr. Clayman opined that petitioner was competent to stand trial and accept a plea, and that petitioner did not lack substantial capacity, due to mental disease or defect, to appreciate the criminality of his conduct or conform his actions to the requirements of the law. Dr. Clayman also reported that petitioner's "visual hallucinations as well as his report of compulsory obedience to homicidal command hallucinations are congruent with known profiles of individuals who have been determined to have been malingering these symptoms for legal benefit."

Dr. Saar reviewed Dr. Clayman's report and re-interviewed petitioner. A short time later, Dr. Saar submitted a follow-up report agreeing with Dr. Clayman's competency conclusion, finding that "based on the passage of time, and current information, [petitioner] appears competent to stand trial at this time." Dr. Saar requested petitioner's records in order to proceed with a determination of criminal responsibility. Based upon the doctors' determinations concerning petitioner's competency, on October 24, 2018, the court entered its order finding petitioner competent to stand trial and giving the parties time to object to that finding. On December 12, 2018, noting that neither party had objected to its October 24, 2018, order, the court scheduled trial to begin on March 18, 2019. In February of 2019, Dr. Saar submitted an additional report, in which he concurred with Dr. Clayman's criminal responsibility determination.

Petitioner's trial, which was bifurcated into guilt and mercy phases, began as scheduled. Various witnesses testified on the State's behalf, but petitioner's assignments of error stemming from the guilt phase of his trial concern only the testimony of Steve Cooper, who was the Chief of Detectives for the CPD.[4] Detective Cooper interviewed petitioner during the investigation into Ms. Jarrett's murder, and the recorded interview was played for the jury. In its direct examination of Detective Cooper, the State did not inquire into petitioner's demeanor or mental state during the interview. On cross-examination, however, petitioner questioned Detective Cooper regarding whether petitioner appeared to be hallucinating, delusional, or otherwise acting abnormally. During one exchange, petitioner asked,

---

preliminary finding on the issue of whether the defendant is competent to stand trial and if not competent whether there is a substantial likelihood that the defendant will attain competency within the next three months.

[4] Petitioner admitted to committing the murder and burglary. His defense centered on his mental state at the time the crimes were committed. Namely, petitioner argued that he had ingested drugs (in particular, a synthetic marijuana called K2) and had a history of mental illness.

Q:      Okay. And you heard talk about [petitioner] following the birds to the house in Kanawha City.

A:      Something about birds, yes.

Q:      Do you believe that he was really led by birds to the house in Kanawha City?

A:      No. I hear a lot of stories like that during interviews and no, I don't think he was led by birds.

Q:      Sounds like it could've been a delusion?

A:      It's not how I took it. The rest of the conversation was too fluid.

On redirect, the State asked, "A second ago under cross when defense counsel asked you about if you thought it was a delusion that the defendant was following birds to the house in Kanawha City, and you indicated that that's not how you took it. How did you take it?" Petitioner objected on the basis that the question called for speculation, but the court overruled the objection. Detective Cooper responded,

A:      I've interviewed literally thousands of people. Probably hundreds of individuals who are either mentally disturbed, psychotic or delusional.

I have never seen a conversation be detailed and fluid the way this conversation went, with someone who was delusional or psychotic or schizophrenic.

Those conversations are very haphazard. They're very choppy. The delusions are interjected throughout the conversation.

But many times after the confession of what is the magnitude of what [petitioner] admitted to during this interview, many times when a confession is made to something heinous, it is followed by some mitigating statement.

"The devil made me do it." Maybe, "I hear voices." So that's—the behavior in the interview room was actually very mil[d] compared to many individuals that I've seen in that very same interview room

So the reason I didn't take it as delusional is because there was no sign of it whatsoever. Until after the confession was made. And it was not uncommon for something similar to be said following that type of interview.

4

At the conclusion of the guilt phase of petitioner's trial, the jury returned a verdict of guilty of murder by arson and burglary by breaking and entering. Following this verdict, the jury returned to the jury room to determine whether to include a recommendation of mercy in their verdict. The jury deliberated for approximately thirty minutes before submitting a note to the court asking, "What happens if the jury cannot reach a unanimous decision?" The court discussed the issue with counsel, noting that it intended to instruct the jury "to keep working . . . . And then if it escalates to the point where they still don't have a verdict, I read them an Allen charge."[5] There was no objection to this proposed response to the jury's question. Accordingly, the court brought the jury back into the courtroom and instructed,

> All right. Ladies and gentlemen, we are early in the process as it relates to this phase of the case, by my calculations. Not exactly, but you all have been deliberating a little bit over half [an] hour.
>
> So you need to have a unanimous decision and I'm going to direct you to go back into the jury room and continue deliberations until you have one. All right? Thank you.

The jury resumed deliberations and ultimately returned a verdict of life in prison, without mercy.

By order entered May 24, 2019, petitioner was sentenced to consecutive terms of life incarceration, without mercy, for felony murder and not less than one nor more than fifteen years for burglary. This appeal followed.

Petitioner raises three assignments of error on appeal. In his first, he asserts that the circuit court failed to follow the statutory procedures for determining his competency to stand trial. The court, first, failed to make a preliminary determination on petitioner's competency to stand trial, as required by West Virginia Code § 27-6A-3(a). Then, the court ordered a second forensic evaluation without complying with West Virginia Code § 27-6A-2(d). Specifically, instead of remaining incarcerated, petitioner asserts that he should have been committed to a mental health facility for additional observation and evaluation. Petitioner claims he was prejudiced by the court's deviation from the proper statutory procedure because Dr. Clayman's report was influenced by the negative opinions of jail employees rather than the opinions of appropriate mental health staff.

"Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 2, *State v. Soustek*, 233 W. Va. 422, 758 S.E.2d 775 (2014) (citation omitted). Petitioner's assignment of

---

[5] An "*Allen* charge" "is a supplemental instruction given to encourage deadlocked juries to reach agreement." *State v. Waldron*, 218 W. Va. 450, 459 n.11, 624 S.E.2d 887, 896 n.11 (2005). The name originated from *Allen v. U.S.*, 164 U.S. 492 (1896). *Waldron*, 218 W. Va. at 459 n.11, 624 S.E.2d at 896 n.11.

error implicates West Virginia Code §§ 27-6A-2 and 27-6A-3. West Virginia Code § 27-6A-2, which addresses, among other things, a defendant's competency to stand trial and observation periods, provides that

> (a) Whenever a court of record has reasonable cause to believe that a defendant in which an indictment has been returned . . . may be incompetent to stand trial it shall, sua sponte or upon motion filed by the state or by or on behalf of the defendant, at any stage of the proceedings order a forensic evaluation of the defendant's competency to stand trial to be conducted by one or more qualified forensic psychiatrists, or one or more qualified forensic psychologists. If a court of record or other judicial officer orders both a competency evaluation and a criminal responsibility or diminished capacity evaluation, the competency evaluation shall be performed first, and if a qualified forensic evaluator is of the opinion that a defendant is not competent to stand trial, no criminal responsibility or diminished capacity evaluation may be conducted without further order of the court. The initial forensic evaluation may not be conducted at a state inpatient mental health facility unless the defendant resides there.
>
> . . . .
>
> (d) If the court determines that the defendant has been uncooperative during the forensic evaluation order pursuant to subsection (a) of this section or there have been one or more inadequate or conflicting forensic evaluations performed pursuant to subsection (a) of this section and the court has reason to believe that an observation period is necessary in order to determine if a person is competent to stand trial, the court may order the defendant be committed to a mental health facility designated by the department for a period not to exceed fifteen days and an additional evaluation be conducted in accordance with subsection (a) of this section by one or more qualified forensic psychiatrists, or a qualified forensic psychiatrist and a qualified forensic psychologist. The court shall order that at the conclusion of the fifteen-day observation period the sheriff of the county where the defendant was charged shall take immediate custody of the defendant for transportation and disposition as ordered by the court.
>
> . . . .

The requirement that competency findings be made within five days of an evaluator's report is contained within West Virginia Code § 27-6A-3:

> (a) Within five days of the receipt of the qualified forensic evaluator's report and opinion on the issue of competency to stand trial, the court of record shall make a preliminary finding on the issue of whether the defendant is competent to stand trial and if not competent whether there is a substantial likelihood that the defendant will attain competency within the next three months. If the court of record orders, or if the state or defendant or defendant's counsel within twenty days of receipt of the preliminary findings requests, a hearing, then a hearing shall

6

be held by the court of record within fifteen days of the date of the preliminary finding, absent good cause being shown for a continuance. If a hearing order or request is not filed within twenty days, the preliminary findings of the court become the final order.

. . . .

Concerning the portion of petitioner's assignment of error related to the court's failure to make a finding on his competency to stand trial within five days of receiving Dr. Saar's report, as required under West Virginia Code § 27-6A-3(a), we note that

[a] trial judge's failure to make a finding on the issue of a criminal defendant's competency to stand trial within five days after the filing of a report by one or more psychiatrists or a psychiatrist and a psychologist in compliance with *W.Va.Code*, 27-6A-1(d) [1977], will not be considered to be reversible error requiring a new trial absent prejudice to the defendant resulting from such failure.

Syl. Pt. 1, *State v. Church*, 168 W. Va. 408, 284 S.E.2d 897 (1981). Petitioner has failed to demonstrate prejudice by this failure because he does not argue that he was prejudiced by it. Instead, petitioner's prejudice arguments concern the court's alleged deviation from the procedures set forth in West Virginia Code § 27-6A-2(d). Petitioner made no objection below to any purported deviation from West Virginia Code § 27-6A-2(d), however. We note that petitioner moved for a determination on competency and commitment to a mental health facility given the passage of four months without a report from Dr. Clayman, claiming that he "remain[ed] warehoused" in jail "unable to have his case tried or to receive mental health treatment that might help him regain competency," but he did not cite or make arguments concerning West Virginia Code § 27-6A-2(d) and its procedures for "commit[ment] to a mental health facility . . . for a period not to exceed fifteen days and an additional evaluation." We have held repeatedly that "[t]o preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect." Syl. Pt. 2, *State v. Craft*, 200 W. Va. 496, 490 S.E.2d 315 (1997) (citation omitted).

When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time.

*State v. LaRock*, 196 W. Va. 294, 316, 470 S.E.2d 613, 635 (1996) (citation omitted). This rule "is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs," and "[i]t prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result)." *Id.* (citation omitted). Because petitioner failed to object to any departure from West Virginia Code § 27-6A-2(d), he has failed to preserve this alleged error for appeal.

7

In petitioner's second assignment of error, he argues that Detective Cooper's testimony concerning petitioner's mental condition was improper. Petitioner states that the detective's testimony went beyond that permitted by a lay person when he testified to the purported characteristics of a delusional or psychotic person. Because testimony concerning the characteristics of a delusional or psychotic individual is the type that would come from an expert in psychiatry, petitioner claims that the testimony was inadmissible under Rule 701 of the West Virginia Rules of Evidence.[6] Petitioner also argues that the testimony should have been excluded under Rule 403 of the West Virginia Rules of Evidence because it was of limited probative value.[7]

In considering this assignment of error, "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." *State v. Johnson*, 238 W. Va. 580, 583, 797 S.E.2d 557, 560 (2017). As with petitioner's first assignment of error, however, we note that petitioner failed to object to Detective Cooper's testimony on the grounds now raised. After the State asked Detective Cooper to explain his testimony that he did not interpret certain comments made by petitioner while he was being interviewed as a sign of delusion, petitioner objected on the ground that the question "call[ed] for speculation on his part"; petitioner did not raise Rule 403 or 701. Thus, petitioner's failure again precludes appellate review of this assignment of error. *See Craft*, 200 W. Va. at 498, 490 S.E.2d at 317, syl. pt. 2 (stating that an issue must be articulated with "sufficient distinctiveness" to preserve it for appellate review).

Finally, in petitioner's third assignment of error, he claims error in the court's instruction to the jury during the mercy phase of his trial that the jury "need[s] to have a unanimous decision and I'm going to direct you to go back into the jury room and continue deliberations until you have one." Petitioner claims that the instruction lacks critical elements of a proper *Allen* charge, including that "the [c]ourt has neither the power nor the desire to compel agreement upon a verdict"; that reaching a verdict is important and desirable "provided . . . that you, as individual jurors, can do so without surrendering or sacrificing your conscientious scruples or personal convictions"; and that each juror's "oath places upon each of you, as individuals, the

---

[6] Rule 701 of the West Virginia Rules of Evidence provides that

[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

[7] Under Rule 403 of the West Virginia Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

responsibility of arriving at a true verdict upon the basis of your own opinion and not merely upon acquiescence in the conclusions of your fellow jurors." *State v. Waldron*, 218 W. Va. 450, 460, 624 S.E.2d 887, 897 (2005); *see also State v. Hobbs*, 168 W. Va. 13, 37, 282 S.E.2d 258, 272 (1981) ("The trial court must carefully instruct the jurors not to give up their conscientious convictions merely for the sake of achieving a verdict . . . .") (citation omitted). Without these admonitions, petitioner claims, the instruction was coercive. Recognizing his failure to object to the giving of the instruction, however, he urges this Court to find plain error.

"To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). But,

> [u]nder the "plain error" doctrine, "waiver" of error must be distinguished from "forfeiture" of a right. A deviation from a rule of law is error unless there is a waiver. When there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined. By contrast, mere forfeiture of a right—the failure to make timely assertion of the right—does not extinguish the error. In such a circumstance, it is necessary to continue the inquiry and to determine whether the error is "plain." To be "plain," the error must be "clear" or "obvious."

*Id.* at 7, 459 S.E.2d at 118, syl. pt. 8.

After the court received the question from the jury, the court read the question aloud to the parties and a discussion ensued regarding how to respond to the question:

> THE COURT: Counsel, we have a question from the jury, and that question is signed by the foreperson and dated.
>
> "What happens if the jury cannot reach a unanimous decision?"
>
> So we're early, we're very—I mean, we're early. So I think my thought would be to—let's see. Do we have any instruction on unanimous verdicts within the charge?
>
> You all can look, too.
>
> [Petitioner's counsel]: We've all been discussing and researching that very issue, Your Honor.
>
> THE COURT: I'm sorry?
>
> [Petitioner's counsel]: We've all been discussing and researching that very issue before the question came from the jury.

9

THE COURT: As to whether or not a recommendation of mercy must be unanimous?

[Petitioner's counsel]: Well, I believe it must be unanimous.

THE COURT: I think it needs to be, yeah.

[Petitioner's counsel]: But then the next question is, what happens if it isn't? What happens if they can't come to a unanimous verdict?

THE COURT: Well, I think that you handle that as you handle any other impasse and basically, you instruct them to keep working and they continue to keep working.

And then if it escalates to the point where they still don't have a verdict, I read them an Allen charge, and you know, I mean, we're very early in the process.

[Petitioner's counsel]: Yes, Your Honor.

THE COURT: So, that's my thought. Just come back here and tell them to go back at it. Needs to be unanimous and keep working.

We'll cross the other bridges if we come to them.

Following this exchange with petitioner's counsel—in which he affirmatively agreed with the court's proposed response to the jury's question—the court read the instruction with which petitioner now takes issue. Under these circumstances, we find that petitioner waived his challenge to the court's instruction and, therefore, there was no error. In *Miller*, we reached the same conclusion where the trial court asked defense counsel whether he wanted to offer any jury instructions, counsel did not offer the instruction he later claimed the court erred in failing to give, and counsel stated that he was satisfied with the court's instruction and had no objection to any portion of the charge. *Id.* at 17, 19, 459 S.E.2d at 128, 130. Just as in *Miller*, the circuit court in this case engaged petitioner in crafting an appropriate response to the jury's question; petitioner did not offer an instruction that included the elements he now claims should have been given or object to the court's proposed response; and, instead, he affirmatively agreed with the court's proposed response.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** July 30, 2020

10

**CONCURRED IN BY:**
Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

**NOT PARTICIPATING:**

Justice Margaret L. Workman