**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 21-0268** (Berkeley County No. 19-F-186)

**Kyle Lewis Taylor,**
**Defendant Below, Petitioner**

**MEMORANDUM DECISION**

Petitioner Kyle Lewis Taylor, the defendant below, by counsel Shawn R. McDermott and Kevin D. Mills, appeals the March 10, 2021, "Amended Sentencing Order" of the Circuit Court of Berkeley County that sentenced petitioner for his conviction on two counts of sexual assault in the second degree. Respondent State of West Virginia, by counsel Patrick Morrisey and Katherine M. Smith, respond in support of the circuit court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

During an October 31, 2018, Halloween party at the residence of M.S.,[1] then a twenty-one-year-old college student and the victim in this case, M.S. became intoxicated and lost consciousness. M.S. claimed that early the next morning, she awoke to petitioner forcibly raping her in her bed. At 1:30 p.m. on November 1, 2018, M.S. went to a hospital and made a report of sexual assault. Deputy Larson of the Berkeley County Sheriff's Department took M.S.'s statement regarding the alleged assault. Sexual Assault Nurse Examiner ("SANE") Carrie Smith performed a sexual assault examination of M.S. who reported voluntary alcohol and drug use prior to the assault, as well as memory loss and lapse of consciousness. As part of the examination, SANE Smith took pictures of M.S.'s body and collected blood samples for a toxicology and potential

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

DNA analysis. Thereafter, Lt. Hall, also from the Berkeley County Sheriff's Department, obtained written statements from M.S., her roommates Brenna T. and Michael M., and her friend, Hailey S.

On November 16, 2018, Lt. Hall served an arrest warrant on petitioner, executed a search warrant for a DNA sample from petitioner, and (after petitioner waived his *Miranda* rights) took a post-arrest custodial statement from petitioner. An October 21, 2019, lab report results indicated that petitioner could not be excluded as the source of the DNA in the swabs taken from M.S.'s vagina on November 1, 2018.

On May 30, 2019, a Berkeley County grand jury indicted petitioner on three counts of sexual assault in the second degree. Count 1 alleged that petitioner attempted to insert his penis into M.S.'s vagina; Count 2 alleged that petitioner attempted to place his mouth on M.S.'s vagina; and Count 3 alleged that petitioner attempted to insert his penis into M.S.'s anus. Count 4 alleged attempted sexual assault in the second degree by forcing or attempting to force M.S. to perform oral sex upon petitioner.

The State provided petitioner with a copy of SANE Smith's report and, on February 13, 2020, designated her as an "expert witness in the field of sexual assault nurse examinations." The State also told petitioner that SANE Smith "will testify as to the examinations she performed on [M.S.] and the findings of her report previously provided for discovery."

On October 12, 2020, petitioner's trial counsel filed a motion in limine

> to restrict, suppress, and prohibit the State's use of any so-called "similar or prior bad acts" evidence [W.V.R.E. Rule 404(b)], absent a showing that they are *relevant* (sufficiently related to the charged offense) to an issue other than character; *necessary* (an essential part of the crimes on trial, or furnished part of the context of the crime); and *reliable*; and absent a showing that the State has complied with the requirements set forth in ***State v. McGinnis***, 193 W. Va. 147, 455 S.E.2d 516 (1994).

(Emphasis in the original.) Specifically, petitioner argued that under West Virginia Rule of Evidence 404(a) and (b), the trial court should preclude: (1) petitioner's statements to a proposed witness, Michael M., that petitioner was wanted on a felony drug manufacturing charge in California, and (2) petitioner's photos of a marijuana grow that he had sent to others. Petitioner argued this information was not relevant to the instant case, had no probative value, and was unfairly prejudicial.

At an October 13, 2020, pretrial hearing, the State said, "[t]hose are prior bad acts, we don't intend to introduce them. I have spoken with our witnesses and advised them that all that stuff is out of bounds. We can't bring it in. So we're fine with that." In a subsequent pretrial order, the court ruled that "[w]ith regard to [petitioner's] Motion in Limine, the State conceded that the information relating to marijuana charges and distribution are prohibited under Rule 404(b) . . . and agreed not to elicit any testimony relating to that topic in its case-in-chief."

Petitioner's trial commenced on October 13, 2020. During its case-in-chief, the State called Lt. Hall, who investigated the case; SANE Smith; forensic scientist and DNA expert Nichole Johnson; M.S.'s three roommates, Thomas B., Michael M. and Brenna T.; M.S.'s friend, Hailey S.; and M.S.

Through Lt. Hall and SANE Smith, the State elicited the contents of the statements made by M.S. and the SANE report without objection from petitioner's counsel. Specifically, Lt. Hall said he spoke with M.S. at the hospital on November 1, 2018, and that she told him the following. She had a party at her house the night before where she became heavily intoxicated. Her friends carried her to her bedroom. Later, she awoke to find petitioner taking off her bottom clothes. She said that, thereafter, she "blacked out" and, when she awoke again, petitioner was having intercourse with her. Lt. Hall testified that M.S. was very upset and he could tell she had been crying. Lt. Hall further testified that at a second interview of M.S., she identified petitioner as her assailant, again said she was very intoxicated at the party, and then broke down in tears. Lt. Hall said that petitioner was thereafter arrested and read his Miranda rights. During petitioner's voluntary statement, he showed Lt. Hall a text message he sent to M.S. stating: "Hey, it's [petitioner]. I just want to let you know that I'm extremely sorry. I like you and I don't want seems [sic] to start off like sh[-]t. If there's anything I can do, please let me know."

The State then called SANE Smith who was qualified as an expert in forensic nursing. SANE Smith testified that M.S. told her that on the night of the Halloween party (1) M.S. drank to the point of losing consciousness and went to bed; (2) she awoke as petitioner was trying to remove her clothes; (3) she told him to "[p]lease stop"; (4) she awoke again and tried to leave the bed, but petitioner pulled her back onto it; (5) she finally gave up "because she just wanted him to finish"; (6) petitioner penetrated her vaginally and anally, and performed cunnilingus on her; and (7) she tried to choke petitioner and push him off of her. SANE Smith also testified regarding her sexual assault examination of M.S. noting that she observed micro-abrasions to the posterior fourchette of M.S.'s vagina and some bleeding from M.S.'s rectum. Ms. Smith classified M.S.'s injuries as consistent with M.S.'s report of a forceful sexual assault. The State then asked the significance of the micro-abrasions on M.S.'s vagina and anus. Ms. Smith replied:

> . . . I have learned that with consensual intercourse versus nonconsensual intercourse any type of vaginal injury that a patient presents [eleven] percent of those patients will have injuries [that are] from consensual intercourse . . . .
>
> Eighty-nine percent of the time [the injuries are] from sexual assault or forced vaginal penetration of someone nonconsensual; . . . [therefore] if you have two areas that are injured, meaning two different areas of injuries in the perineum area, it is more indicative of a nonconsensual assault.

The State next called Nicole Johnson, a forensic scientist at the West Virginia State Police Forensic Lab, Biology DNA Section, who was qualified as an expert in biochemistry and DNA analysis. Ms. Johnson testified that she analyzed M.S.'s vaginal wall swabs and petitioner's specimens and concluded that the DNA in M.S.'s vaginal swabs was consistent with petitioner's DNA profile.

Thomas B., one of M.S.'s roommates, was the State's next witness. He testified that at the time of the Halloween party, he lived with M.S., Michael M., and Brenna T., and that they all went to college together. Thomas testified that he, his roommates, Hailey S., and petitioner were present at the party and that, except for petitioner, the attendees were all close friends. Thomas said he saw petitioner having casual conversation with those at the party but nothing to show that M.S. was romantically interested in petitioner. Thomas further testified that M.S. became very drunk, was throwing up and slurring her words, and went to bed early. Thomas said M.S. did not drink often and, when she did, she had "maybe one or two spritzers." Thomas also said that when he went to bed two people were still at the party: Hailey and petitioner. Thomas said he learned of the assault the next day and that M.S.'s behavior changed thereafter in that she became very withdrawn, did not often leave the house, and was not comfortable in the house.

On cross-examination, petitioner's counsel asked Thomas about the alcohol, marijuana, and opiates at the Halloween party. Thomas admitted that M.S. was using "marijuana wax" that night. During an ensuing sidebar, the State argued that petitioner's counsel had opened the door to Rule 404(b) evidence from other witnesses that petitioner was the person who brought the marijuana to the party. Defense counsel countered that the State had disclosed no such evidence and that intoxication went to M.S's. state of mind. The court ruled that the defense had opened the door to who brought the marijuana to the party, but that the State could not elicit testimony as to whether petitioner was dealing marijuana. On redirect, the State asked Thomas who supplied the marijuana to M.S. on the night of the party. Thomas replied that he did not remember who supplied the marijuana.

The State next called Michael M. who testified that he was one of M.S.'s three roommates, that he attended the Halloween party, and that he first met petitioner at the party. Michael said that in addition to marijuana wax there was also "flower form marijuana" at the party. When asked by the State who provided the marijuana, Michael said that petitioner brought it and sold it to M.S. Immediately thereafter at a side bar regarding the marijuana testimony, petitioner's counsel said, "I thought you ruled that the prejudicial effect outweighed the probative value and we weren't going to go there." The court responded, "Well, I don't know that the question that was asked was responded to the way I would have expected it to be responded to." The State argued that the evidence was "intrinsic to the case and it's been made intrinsic by [petitioner's counsel's] arguments. He's made the marijuana a huge part of this case, so I think that makes the sale to the victim part of this case as well." The Court replied, "Well, let's not go any – or delve any deeper into the marijuana issues." Petitioner's counsel said he was "satisfied" with that result.

Thereafter, Michael continued his testimony stating that M.S. did not drink often; that, at the party, M.S. was so intoxicated he was afraid she would fall off the balcony; and that M.S. had no control and her sentences were barely coherent. Michael further testified that he did not observe M.S. being affectionate in any way to petitioner. Michael then said that he heard petitioner ask M.S., "What's the deal with your boyfriend?" and, "What do you think about me?" and tell her, "I think you're really attractive." Michael testified that M.S. replied something to the effect that "I don't know you very well." Michael said that in response to petitioner's statements, he asked Brenna to "intercept" the conversation between petitioner and M.S. and that Brenna complied and broke up the conversation. Michael said he also heard petitioner tell petitioner's friend, Hailey, that "I have slept with over a thousand women" in a bragging tone. Michael said that petitioner

asked him where petitioner could get some "pussy" on the nearby college campus and if he knew any loose women or could find him a woman to have sex with. Finally, Michael testified that, following the party, M.S. became "very withdrawn, wasn't comfortable in her own home," did not go back to work for a very long time, did not go into her bedroom for months, and slept with the lights on.

Brenna T., petitioner's third roommate, testified that (1) at the Halloween party, petitioner made suggestive comments to M.S. and Hailey; (2) she heard petitioner tell M.S. that he found her very attractive and that he asked M.S. if she felt the same way about him; (3) at no point in the party did M.S. appear to be romantically interested in petitioner; (4) M.S. had consumed so much alcohol that she lacked motor skills, could hardly talk, was throwing up, and was falling down by the time she was put to bed; (5) she and Hailey put M.S. to bed in M.S.'s room; (6) she checked on M.S. later and M.S. had thrown up on herself so Brenna changed her into a T-shirt and shorts; (7) she checked on M.S. again and found her "unconscious"; (8) she awoke early and found petitioner sleeping on a sofa in the apartment; (9) soon thereafter M.S. told her that petitioner had raped her; (10) she went with petitioner to the hospital that same day; and (11) after the Halloween party, M.S. "was not speaking very much . . . crying, not sleeping really at all, not feeding herself."

Following this evidence, the court asked the jury whether "anyone [of them] would prefer that we not have one more witness today and go to about 6:00 p.m.?" One juror asked for a quick break. Thereafter, the proceedings resumed and the State called Hailey S. who testified that she and M.S. had become best friends; M.S. drank too much at the Halloween party and ended up in bed; and M.S. told her that petitioner took advantage of her, that she had tried to stop petitioner but was too weak, and that she eventually just let it happen.

The next day, Friday, October 16, 2020, the State called M.S. who testified as follows: She met petitioner about two weeks before the Halloween party and did not know him well. At the party, she sensed that petitioner was interested in her romantically. She was drinking tequila at the party and became pretty drunk. She did not recall flirting, kissing, or making out with petitioner. She did recall petitioner saying that that "I think you're really attractive and I know you think I am too." She recalled replying, "I don't know you very well." She said she felt cornered by petitioner and was grateful when Brenna pulled her aside. She did not recall her friends putting her to bed. She said she awoke in bed with petitioner above her and pulling off her bottoms. She asked him to stop several times, started to cry, and lost consciousness. She said she felt "confused and terrified" and that her friend Hailey was supposed to be sleeping next to her. When she regained consciousness, both she and petitioner were naked and petitioner was on top of her and having sex with her. She said she tried to choke petitioner and told him she hated him, but he laughed in her face. She also said that she got out of her bed several times and tried to get dressed but that petitioner pulled her back onto the bed each time. M.S. said that petitioner penetrated her vaginally and anally and performed oral sex on her. M.S. also said that petitioner asked her to perform oral sex upon him but she refused. She said she finally quit fighting when she realized petitioner would not stop until he climaxed, which he eventually did. Petitioner then left her room. She said that the next day, when she told Hailey that petitioner had raped her, Hailey and Brenna took her to the hospital.

On cross-examination, petitioner's counsel asked M.S. if she went to petitioner's house the day before the Halloween party. M.S. replied that she went to petitioner's house on the day of the party and "purchased weed from him." At a sidebar, petitioner's counsel sought a mistrial on the ground that the jury had now heard a second time that petitioner sold marijuana to M.S. The State countered that the defense posed that question and that M.S. answered it honestly. The defendant countered that M.S. answered a question it did not ask. The court found that M.S.'s statement did not rise to the level of a mistrial, that the jury had already heard about petitioner's sale of marijuana, that "weed is so commonly accepted in the community now[; in the] vast majority of the states it's legal. I just don't think that it's that prejudicial, that it's going to create an unfair advantage for the State."

The State's last witness was Katie Spriggs, the executive director of the Eastern Panhandle Empowerment Center, who was designated as an expert in the field of victim responses to sexual assault. Ms. Spriggs testified to normal victim behavior following a sexual assault. Specifically, Ms. Spriggs testified that it is "incredibly common" for victims of sexual assault to give up fighting and to let the assault happen as a way of getting through it.

Thereafter, petitioner moved for a judgment of acquittal on all four counts. Regarding Count 4, which alleged attempted sexual assault in the second degree by forcing or attempting to force M.S. to perform oral sex upon petitioner, petitioner argued that the State presented no evidence in support of that count as the testimony on that charge was that petitioner told M.S. to "suck it" and she said, "no."

Prior to the onset of petitioner's case-in-chief, his counsel asked the court if he could ask petitioner "Did you sell marijuana?" without opening the door to the State's admission of other drug-related evidence. The State responded, "[W]e're in odd territory where [the defense] keeps objecting to its own questions and then continues with those questions after he makes objections." The court allowed the question and stated that doing so would not open the door to other drug-related evidence.

Petitioner was the only witness for the defense. He testified that on October 30, 2018, M.S. and Hailey came to his home and that M.S. invited him to the Halloween party. Petitioner denied selling "weed" to M.S. during that visit. Petitioner said he asked M.S. if he could bring anything to the party and that M.S. suggested tequila. Petitioner said that he and Hailey purchased tequila and took it to the party. He further testified that, at the party, he and M.S. were "[k]issing with tongues" and that M.S. was very receptive and that she held petitioner. He said that he told M.S. that she was very attractive and that she returned the compliment. He testified that M.S. voluntarily accompanied him to her bedroom and did not object when he kissed her, took off her bottoms, and performed oral sex on her. Petitioner then said that he and M.S. engaged in consensual intercourse and that, at one point, he accidentally penetrated her anus. Following this testimony, the defense rested and petitioner renewed his motion for a judgment of acquittal, which the court denied. Closing arguments concluded around 3:00 p.m.

Thereafter, the trial court told the parties that "I intend to keep this jury here as late as they are willing to stay unless I notice that any of them are beginning to falter. The last thing this [c]ourt wants is a juror to be in a position where they're getting so tired, they give into the will of others."

6

[I]f they can go [to] probably about ten o'clock, I would keep them here, just so if there's anybody with any obligations tonight you would be aware of that. I really don't want them weighing the case over the weekend and have the temptation of discussing where they are and what's happening in the jury room with family and friends. I like to – Friday is the last day and it goes to deliberation, I like to finish on Friday to alleviate that concern.

During their deliberations, the jurors sent two questions to the court: (1) whether they could break for dinner; and (2) the definition of the specific event Count 4 (regarding the allegation of oral sex) referenced. The court answered the second question by telling the jury that they had to rely on the documents and evidence adduced at trial. Thereafter, pizza was delivered to the jury room as the jurors deliberated.

At 9:00 p.m., the court brought the jurors back into the courtroom. The court asked the jurors if any of them was so fatigued that they "feel like they're checking out." One juror raised his/her hand and indicated that s/he would like to go home and come back the next day. The court asked that juror if s/he could deliberate for one more hour. The juror said that s/he preferred to go home but would give it another hour. The court asked petitioner's counsel if he was "feeling prejudice." Defense counsel replied: "No, no, we're good, we're good, Your Honor." The jury stopped deliberating at 10:00 p.m. without reaching a verdict.

The jury resumed deliberations at 1:00 p.m. on Saturday. (That later start time was set because one of the jurors had scheduled medical testing for Saturday morning.) Thereafter, the jurors sent the court a message providing that they could not "make a decision for Counts One and Three, what would you like us to do?" The State suggested "that's close to calling yourself a hung jury." Therefore, the State suggested an *Allen* charge.[2] Defense counsel agreed stating, "I think that would be an appropriate way to proceed, Your Honor." The court then read the jury the following charge that was signed by both petitioner's counsel and the State:

> [Y]ou have informed the [c]ourt . . . of your inability to reach a verdict. At the outset, the [c]ourt wishes you to know that although you have a duty to reach a verdict if that's possible, the [c]ourt has neither the power nor the desire to compel agreement on a verdict.
>
> The purpose of these remarks is to point out to you the importance and desirability of reaching a verdict in this case provided however that you as individual jurors can do so without surrendering or sacrificing your conscientious scruples or personal convictions.

---

[2] "The *Allen* charge, often called the 'dynamite charge,' is a supplemental instruction given to encourage deadlocked juries to reach agreement." Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure*, Vol. II, page 257 (2nd Ed.1993). The name for this particular instruction originated from the case of *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

You'll recall that upon assuming your duties in this case each of you took an oath[.] [T]hat oath places upon each of you as individuals the responsibility of arriving at a true verdict upon the basis of your own opinion and not merely upon acquiescence to the conclusion of your fellow jurors; however, it by no means follows that opinions may not be changed by conference in the jury room.

The very object of the jury system is to reach a verdict by a comparison of proofs with your fellow jurors. During your deliberations you should be open minded and consider the issues with proper deference to and respect for the opinions of each other and you should not hesitate to reexamine your own view in light of such discussions.

You should consider also that this case must at some point be terminated; that you are selected from the same source from which any future jury may be selected; that there is no reason to support that the case will ever be submitted to [twelve] person more intelligent, more impartial, or more competent to decide or that more or clearer evidence will ever be produced on one side or the other.

The court concluded that "[w]ith that instruction in mind, we're going to send you back in the jury room and ask you to continue working."

An hour later, the jury found petitioner guilty on Counts One and Two and acquitted petitioner on Counts Three and Four.

Post-trial, petitioner moved for a new trial and/or judgment of acquittal arguing that the court erred in (1) giving an *Allen* charge; (2) denying petitioner's motion for a mistrial given that witnesses testified that petitioner sold marijuana; and (3) failing to direct a verdict in petitioner's favor. The State objected to the motion and the court denied it.

In an "Amended Sentencing Order" entered March 10, 2021, the trial court sentenced petitioner for his conviction of sexual assault in the second degree as contained in Count 1 of his indictment to an indeterminate sentence of not less than ten nor more than twenty-five years in prison, plus a $10,000 fine. The circuit court sentenced petitioner for his conviction of sexual assault in the second degree as contained in Count 2 of his indictment to the same sentence. The circuit court then ordered the sentences to run consecutively for an effective combined sentence of not less than twenty nor more than fifty years in prison to be followed by fifty years of supervised release. The trial court also required petitioner to register as a sexual offender for life.

Petitioner now appeals and raises five assignments of error. In his first assignment of error, petitioner argues that all four counts of his indictment were insufficient on their face because they are duplicitous and wrongfully combined two offenses in a single count. Petitioner divides his argument on this assignment of error into three sections. In the first section, petitioner argues that the indictment was insufficient due to duplicity because each count charged petitioner with two separate offenses calling into question the unanimity of the convictions.

"Duplicity is 'the joining in a single count of two or more distinct and separate offenses.'"

8

*United States v. Pleasant*, 125 F.Supp.2d 173, 175 (E.D.Va. 2000) (quoting *United States v. Hawkes*, 753 F.2d 335, 357 (4th Cir. 1985)). "The risk behind a duplicitous charge is that a jury may convict the defendant without unanimous agreement on a particular charge." *Id.* at 175 (quoting *United States v. Moore*, 184 F.2d 790, 793 (8th Cir. 1999)). The policy behind outlawing duplicitous counts includes

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

*United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981). However, "[a] count is not duplicitous . . . merely because it alleges alternative means of completing a single offense. . . . Where an indictment or information contains a duplicitous count, the proper remedy is to dismiss the count or to require the United States to elect which offense it desires to pursue." *Pleasant*, 125 F.Supp. 2d at 176.

Petitioner was charged under West Virginia Code § 61-8B-4 which regards the crime of sexual assault in the second degree. That crime may be committed in two ways: first, where a "person engages in sexual intercourse or sexual intrusion with another person without the person's consent, and the lack of consent results from forcible compulsion," *id.* § 61-8B-4(a)(1); or where a "person engages in sexual intercourse or sexual intrusion with another person who is physically helpless." *Id.* § 61-8B-4(a)(2). Petitioner notes that each count of his indictment alleged that petitioner violated § 61-8B-4(a)(2) by engaging in sexual intercourse/sexual intrusion when M.S. was physically helpless. He highlights, however, that each count also alleged that "the lack of consent results from forcible compulsion or being physically helpless." Thus, petitioner argues that because each count of the indictment alleged that petitioner violated both § 61-8B-4(a)(2) and -4(a)(1), each count was impermissibly duplicitous.

Petitioner further contends that the error was not corrected by the jury instructions because the State did not elect the subsection under which it wished to proceed. Instead, the circuit court instructed that, for each count of the indictment, the State had to prove beyond a reasonable doubt that M.S.'s lack of consent resulted from forcible compulsion or because the act occurred when she was physically helpless. Petitioner claims he was prejudiced by that instruction because the jury's verdicts on Counts 1 and 2 might have resulted from less than a unanimous verdict, i.e., some jurors may have been convinced beyond a reasonable doubt that M.S. was physically helpless while others may have been convinced of no consent/forcible compulsion.

We reject petitioner's claim that the four counts of his indictment are duplicitous because he failed to make that objection *prior* to trial. Claims of duplicity must be raised before trial in order to preserve them for appeal. Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure provides:

> (b) **Pretrial Motions**. Any defense, objection or request which is capable of determination without the trial of the general issue may be raised before trial by

motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

> . . . .

> (2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings)[.]

This rule prevents "a criminal defendant from 'sandbagging' or deliberately foregoing raising an objection to an indictment so that the issue may later be used as a means of obtaining a new trial following conviction." *State v. Chic-Colbert*, 231 W. Va. 749, 758, 749 S.E.2d 642, 651 (2013) (quoting *State v. Palmer*, 210 W. Va. 372, 376, 557 S.E.2d 779, 783 (2001)).

Here, petitioner fails to cite to the record to show where he made any pretrial claim that his indictment was "duplicitous." West Virginia Rule of Appellate Procedure 10(c)(7) requires that the argument section of an appellant's brief "must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal. *The Court may disregard errors that are not adequately supported by specific references to the record on appeal.*" *State v. Trail*, 236 W. Va. 167, 186, 778 S.E.2d 616, 635 (2015).

Petitioner next claims that the trial court erred in denying his motion for a judgment of acquittal on Count 4 even though he was acquitted on that count. However, once a jury acquits on a count, the fact that a trial court did not grant an acquittal is moot. *See*, *e.g.*, *State v. Williams*, 660 N.E.2d 724, 732 (Ohio 1996). "A moot case generally cannot properly be considered on its merits." *State ex rel. Bluestone Coal Corp. v. Mazzone*, 226 W. Va. 148, 156, 697 S.E.2d 740, 748 (2010). Thus, "[c]ourts will not ordinarily decide a moot question." Syl. Pt. 1, *Tynes v. Shore*, 117 S.E.2d 355, 185 S.E. 845 (1936).

Finally, petitioner speculates that the trial court's failure to grant his motion for a judgment of acquittal led to a "compromise" verdict. We disagree. The jury was instructed that "[a] separate crime is charged against [petitioner] in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." "Where a case has been submitted to a jury an appellate court cannot presume that the jury did not understand or follow the clear import of the instructions given." *Dustin v. Miller*, 180 W. Va. 186, 189, 375 S.E.2d 818, 821 (1988). Instead, "a jury is presumed to follow the court's instructions." *Showalter v. Binion*, No. 18-0128, 2019 WL 6998319, at 4* (W. Va. Dec. 20, 2019) (memorandum decision). Accordingly, we find no error.

In petitioner's second assignment of error, he argues that he was prejudiced by the State's introduction of SANE Smith's expert opinion testimony at trial because he was not notified of that testimony prior to trial and, therefore, was unprepared to rebut it. Specifically, petitioner references SANE Smith's trial testimony that (1) in 89% of cases where micro abrasions are found on a victim's vagina, the abrasions are caused by non-consensual intercourse, and (2) it was more likely

than not that the intercourse between petitioner and M.S. was non-consensual because M.S. had micro abrasions on her vagina and anus. Petitioner contends that the State had a duty to disclose SANE Smith's proposed testimony under Rule 16(a)(1)(E) of the West Virginia Rules of Criminal Procedure ("[T]he state shall disclose to the defendant a written summary of testimony the state intends to use under Rule 702, 703, and 705 of the Rules of Evidence during its case in chief at trial. The summary must describe the witnesses' opinions, the bases and reasons therefor, and the witnesses' qualifications."). Petitioner further argues that SANE Smith's proposed testimony should have been subject to analysis under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Relying on two journal articles,[3] petitioner contends that SANE Smith's opinion was erroneous and that it does not satisfy *Daubert* because the authors of the article state that physical injury alone cannot indicate whether sexual contact was consensual. Finally, petitioner admits that his trial counsel did not object to the State's alleged failure to disclose SANE Smith's findings or to her testimony regarding those findings at trial.

Because petitioner did not object to SANE Smith's testimony, that testimony is subject to a plain error analysis. To prove plain error, the proponent must show "there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, in part, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). "[T]he plain error doctrine is reserved for only the most flagrant errors." *State ex rel. Games-Neely v. Yoder*, 237 W. Va. 301, 310, 787 S.E.2d 572, 581 (2016).

Petitioner fails to show plain error regarding SANE Smith's testimony because he was clearly notified by the State that SANE Smith would testify at trial as a fact witness and, possibly, as an expert witness to the examinations she performed on the victim and to the findings in her report previously provided as discovery. Specifically, the record on appeal shows that on February 13, 2020, the State filed a "DESIGNATION OF EXPERT WITNESS" notifying petitioner of the following:

> [T]he State . . . pursuant to W.Va.R.Cr. P. 16(a)(1)(E) and T.C.R. 32.03(a)(11) . . . gives notice that [SANE] Carrie Smith, a previously disclosed witness for the State, may also be called as an expert witness during the trial in this case.
>
> Ms. Smith will testify as a fact witness and may testify as an expert in the field of sexual assault nurse examination. Ms. Smith is a registered nurse working as a sexual assault nurse examiner at the Berkeley Medical Center, and will testify to the examinations she performed on the victim and the findings of her report previously provided as discovery. A copy of her CV will be provided.

---

[3] *See* Sung Hoon Song and John R. Fernandes, *Comparison of Injury Patterns in Consensual and Nonconsensual Sex: Is It Possible to Determine if Consent was Given?*, Acad. Forensic Pathology, 2017 Dec. (7)(4): 629-631; Sarah Anderson, *Genital Findings in Women after Consensual and Nonconsensual Intercourse*, Journal of Forensic Nursing 2006, Summer; (2)(2)(59-65).

Petitioner does not argue that he did not receive the "DESIGNATION OF EXPERT WITNESS" regarding SANE Smith, "her report previously provided as discovery," or her CV. The "SANE Report" was also listed on the "STATE'S EXHIBIT LIST." Nor does petitioner contend that the State precluded him from deposing SANE Smith prior to trial.

Petitioner also argues that SANE Smith's testimony was erroneous because "[t]he scientific consensus is that physical injury alone cannot indicate whether or not sexual interaction was consensual." "In criminal cases, plain error is error which is so conspicuous that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in directing the error." *State v. Marple*, 197 W. Va. 47, 52, 475 S.E.2d 47, 52 (1996). Petitioner's claim – that SANE Smith's conclusions were so wrong that they was inadmissible – is not within the court's knowledge given that judges are not medical experts. Moreover, SANE Smith admitted at petitioner's trial that physical injury could occur during consensual sex. Thus, in the absence of evidence in the record showing that Ms. Smith's testimony was unreliably inadmissible, we find this assignment of error fails to satisfy the plain error standard.

In petitioner's third assignment of error, he argues that the circuit court impermissibly coerced the jury to reach a verdict by the totality of its actions and statements.

> Whether a trial court's instructions constitute improper coercion of a verdict necessarily depends upon the facts and circumstances of the particular case and cannot be determined by any general or definite rule. *Janssen v. Carolina Lumber Co.*, 137 W.Va. 561, 73 S.E.2d 12 (1952). It is generally held that when a jury is unable to agree on a verdict, it is within the trial court's discretion to urge an earnest effort to agree, so long as the jurors are free to act without any form of coercion by the trial court. 89 C.J.S. Trial s 481(a) (1955); 76 Am.Jur.2d Trial s 1054 (1975). The trial court must carefully instruct the jurors not to give up their conscientious convictions merely for the sake of achieving a verdict, and must scrupulously avoid expressing any opinion as to how the case should be decided. The trial court decision to so instruct the jury must neither encourage disagreement nor coerce agreement, *State v. Taft*, 144 W.Va. 704, 110 S.E.2d 727 (1959), but should foster the jury's fair and open-minded debate.

*State v. Hobbs*, 168 W. Va. 13, 37, 282 S.E.2d 258, 272 (1981).

In support of this assignment of error, petitioner points to the following: On the first day of trial, a Thursday, the trial court kept the jury until 6:00 p.m. The next day, a Friday, the jury began deliberating around 3:00 p.m. and had not reached a verdict by 5:00 p.m. The court had the jurors eat dinner in the jury room while they worked. By 9:00 p.m. they still had no verdict. At that point, even though one of the jurors wanted to go home, the court asked the jurors to work one more hour. The jurors left at 10:00 p.m. but returned the next day at 1:00 p.m. and deliberated until 5:00 p.m. At that time, they were deadlocked on Counts 1, 2, and 3. However, an hour after the court gave its *Allen* instruction, the jurors reached a split verdict: guilty on Counts One and Two and acquittals on Counts Three and Four. Petitioner argues that the trial court coerced jurors into reaching that verdict given that they were deadlocked on three counts just an hour before the *Allen* charge was read. Petitioner admits that he did not object to the reading of the *Allen* charge or the

12

manner in which the circuit court managed the timing of the jurors' deliberations. Therefore, he argues, if the plain error doctrine applies, it is satisfied in this case because the trial court coerced a verdict from a tired jury.

As we noted above, to prove plain error, the proponent must show "there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Miller*, 194 W. Va. at 7, 459 S.E.2d at 118, Syl. Pt. 7, in part. "[T]he issue of whether a trial court improperly coerced a verdict 'necessarily depends upon the facts and circumstances of the particular case and cannot be determined by any general or definite rule.'" *State v. Pannell*, 225 W. Va. 743, 748, 696 S.E.2d 45, 50 (2010) (quoting Syl. Pt. 2, *State v. Spence*, 173 W.Va. 184, 313 S.E.2d 461 (1984)). "To safeguard the integrity of its proceedings and to insure the proper administration of justice, a circuit court has inherent authority to conduct and control matters before it in a fair and orderly fashion." Syl. Pt. 2, *State v. Fields*, 225 W. Va. 753, 696 S.E.2d 269 (2010). "Our review of the trial court's manner of conducting the trial is for an abuse of discretion[.]" *State v. Davis*, 232 W. Va. 398, 414, 752 S.E.2d 429, 445 (2013).

Petitioner fails to show that the trial court abused its discretion or plainly erred in conducting his trial. When the court suggested that the jury deliberate for another hour on Friday night, it asked petitioner's counsel if he had any objection. Petitioner's counsel responded, "No, no, we're good, we're good, Your Honor." Thus, petitioner's complaints in this regard were knowingly and intentionally relinquished or abandoned. *See Miller*, 194 W. Va. at 7, 459 S.E.2d at 118, Syl. Pt. 8, in part. "[W]aiver necessarily precludes salvage by plain error review." *State v. Knuckles*, 196 W. Va. 416, 421, 473 S.E.2d 131, 136 (1996). "In other words, 'when a right is waived, it is not reviewable even for plain error.'" *State v. Myers*, 204 W. Va. 449, 460, 513 S.E.2d 676, 687 (1998) (quoting Syl. Pt. 6, *State v. Crabtree*, 198 W. Va. 620, 482 S.E.2d 605 (1996)). As for the jury's Saturday deliberations, the record shows no complaints from either petitioner or the jurors. Moreover, the court never asked the jury to reach a verdict within a specific time period or to reach a verdict at all. Instead, the court was solicitous of the jurors and their concerns. Finally, "[t]here is no suggestion that the trial judge intimated impatience or displeasure with the jury by his instruction, facial expression, or tone of voice." *Blango v. United States*, 335 A.2d 230, 234 (D.C. 1975). Accordingly, we find no error.

In petitioner's fourth assignment of error, he argues that (1) he was prejudiced when State witnesses made unsolicited comments that petitioner sold or was in possession of marijuana, and (2) the trial court erred in failing to grant a mistrial due to those unsolicited comments.

> The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403.

*State v. LaRock*, 196 W. Va. 294, 310-11, 470 S.E.2d 613, 629-30 (1996).

13

Pretrial, petitioner filed a motion in limine to exclude any evidence of his criminal history and his bragging about being a marijuana dealer in California. The State agreed not to offer any evidence of petitioner's purported drug dealing. Thus, the court did not hold a hearing under *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994), on that issue. Thereafter, at trial, *petitioner's* counsel asked about M.S.'s marijuana use at the Halloween party given that her state of mind and level of intoxication was an issue at trial.

Petitioner argues that under *McGinnis*, the marijuana evidence would have been inadmissible because selling marijuana was not relevant to the sexual assault charges and was not intrinsic evidence of sexual assault. Petitioner contends that he suffered extreme prejudice from the admission of the marijuana testimony because selling marijuana is a felony offense in West Virginia and in the United States. Thus, petitioner argues that the marijuana testimony implicated that he had committed a felony. Finally, petitioner argues that his trial counsel did not have the opportunity to voir dire the jurors about their feelings regarding drugs, marijuana, and addiction to petitioner's detriment.

The trial court did not abuse its discretion in denying a mistrial regarding the marijuana-related testimony. "[R]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Williams*, 198 W. Va. 274, 279, 480 S.E.2d 162, 167 (1996). "The decision to declare a mistrial, discharge the jury, and order a new trial in a criminal case is a matter within the sound discretion of the trial court." Syl. Pt. 8, *State v. Davis*, 182 W. Va. 482, 388 S.E.2d 508 (1989). "An appellate court should find an abuse of discretion only when the trial court has acted arbitrarily or irrationally." *State v. Beard*, 194 W. Va. 740, 748, 461 S.E.2d 486, 494 (1995). "[B]ecause mistrials are strong medicine . . . , it is only rarely—and in extremely compelling circumstances— that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision that the interests of justice do not require aborting an ongoing trial." *United States v. Pierro*, 32 F.3d 611, 617 (1st Cir. 1994).

As noted above, on cross-examination, Thomas stated there was marijuana at the party and that M.S. was using it. At a sidebar, the State argued that petitioner's counsel had opened the door to Rule 404(b) evidence regarding who supplied the marijuana for the party. The court agreed. On redirect, Thomas said he did not remember who brought the marijuana to the party. Thereafter, Michael testified that M.S. brought the marijuana to the party. Following Michael's testimony, the trial court precluded any additional testimony regarding the marijuana. Petitioner's counsel said he was satisfied with that ruling. M.S. then testified that she went to petitioner's house the day before the party and bought "weed" from him. Petitioner moved for a mistrial claiming prejudice. The court denied that motion because (1) the jury had already heard about the marijuana, (2) marijuana is "commonly accepted" and legal in several states, and (3) the comment was not prejudicial to petitioner or unfairly advantageous to the State.

Because petitioner's counsel opened that door to the marijuana-related testimony, the evidence became admissible without a *McGinnis* hearing. Moreover, in the order denying petitioner's post-trial motions, the circuit court found that the evidence petitioner sold marijuana to M.S. was intrinsic "[a]s the charges contained allegations of sexual assault of an inebriated

victim, [petitioner] providing marijuana is intrinsic and therefore not subject [to] analysis under Rule 404(b)." "[E]vidence which is 'intrinsic' to the indicted charge is not governed by Rule 404(b)." *State v. Harris*, 230 W. Va. 717, 722, 742 S.E.2d 133, 138 (2013). Accordingly, because (1) the trial court properly concluded that the evidence of petitioner's sale of marijuana was not unduly prejudicial, and (2) limited the evidence regarding marijuana, we find that it did not err in denying petitioner's motion for a mistrial regarding the marijuana-related testimony.

In petitioner's fifth and final assignment of error, he argues that the evidence at trial was insufficient as a matter of law to support his two convictions for second-degree sexual assault because reasonable minds could not have concluded that petitioner was guilty on those counts.

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. . . .

Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

"When considering sufficiency-of-evidence claims, this Court's review is highly deferential to the jury's verdict." *State v. Thompson*, 240 W. Va. 406, 414, 813 S.E.2d 59, 67 (2018). A petitioner "must prove there is *no* evidence from which the jury could find guilt beyond a reasonable doubt." *State v. Zuccaro*, 239 W. Va. 128, 145, 799 S.E.2d 559, 576 (2017) (emphasis in the original).

Petitioner does not claim that the State failed to prove any of the elements of the crimes for which he was convicted. Instead, he assails M.S.'s credibility. In invoking the inherent credibility standard, petitioner faces a difficult hurdle as "the bar has been set extremely high for declaring testimony inherently incredible." *State v. Benny W.*, 242 W. Va. 618, 627, 837 S.E.2d 679, 688 (2019). "[T]estimony should be found inherently incredible 'only when the testimony defies physical laws.' *State v. McPherson*, 179 W.Va. 612, 617, 371 S.E.2d 333, 338 (W.Va. 1988)." *State v. Kenneth M.*, No. 12-0233, 2013 WL 2157826, at *2 (W. Va. May 17, 2013) (memorandum decision). Here, the jury assessed M.S.'s testimony and clearly found it to be credible regarding Counts 1 and 2 of petitioner's indictment and not credible regarding Courts 3 and 4.

Finally petitioner argues that M.S.'s inebriation at the party made her testimony regarding petitioner unreliable. Again, credibility determinations are made by the jury and not by a reviewing court. "[T]his Court has long held that credibility determinations are made by the jury." *State v. Smith*, 225 W. Va. 706, 713, 696 S.E.2d 8, 15 (2010). Moreover, a witness's intoxication does not provide grounds for an appellate court to reject a jury's findings that the witness was credible. *See, e.g.*, *United States v. Rodriquez*, 116 F.3d 1225, 1227 (8th Cir. 1997). Therefore, we find no error.

Accordingly, for the foregoing reasons, we affirm the circuit court's March 10, 2021, "Amended Sentencing Order."

Affirmed.

**ISSUED:** April 25, 2022

**CONCURRED IN BY:**

Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan Moats sitting by temporary assignment

**DISSENTING:**

Chief Justice John A. Hutchison

Hutchison, C. J., dissenting:

I dissent to the majority's resolution of this case. I would have set this case for oral argument to thoroughly address the error alleged in this appeal. Having reviewed the parties' briefs and the issues raised therein, I believe a formal opinion of this Court was warranted—not a memorandum decision. Accordingly, I respectfully dissent.